UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| Roeslein & Associates, Inc. and | ) | |
| Roeslein Alternative Energy, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:17-cv-01351-JMB |
| | ) | |
| Thomas Elgin, | ) | **JURY TRIAL DEMANDED** |
| Elgin Meyer Bioenergy Co., | ) | |
| J.S. Meyer Engineering, P.C., and | ) | |
| M & K Chemical Engineering Consultants, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Comes the Plaintiffs, Roeslein Alternative Energy, LLC ("RAE") and Roeslein &

Associates, Inc. ("Roeslein") and for their First Amended Complaint ("Complaint") against the

Defendants, Thomas Elgin ("Elgin"), Elgin Meyer Bioenergy Co. ("EM Bioenergy"), J.S. Meyer

Engineering, P.C. ("JS Meyer"), and M & K Chemical Engineering Consultants, Inc. ("M&K")

(collectively "Defendants") state and allege as follows:

## INTRODUCTION

1.     Plaintiffs are Missouri corporations with offices in Crestwood, Missouri.  During

the relevant periods, Plaintiffs developed energy production facilities that use agricultural and

industrial wastes to create green renewable alternative energy solutions.

2.     Roeslein and RAE use cutting-edge alternative energy solutions to help

landowners to promote ecological and economic sustainability and restore native prairie lands.

3.      Roeslein and RAE have invested significant time, effort, and financial resources to refine and perfect their existing processes, as well as develop new technologies, methods, and energy solutions.

4.      In June of 2010, Roeslein hired Defendant Elgin as the Director of the Process & Energy Business Unit to assist it in the development of their renewable energy facilities and develop new technologies, methods, and energy solutions.

5.      During his employment with Roeslein, Elgin moved from his position of Director at Roeslein to Director of RAE and worked as Vice President of Roeslein Alternative Energy of Missouri, an LLC of which RAE is the sole member.

6.      About five years later, in January of 2015, Elgin left Roeslein and RAE and began working for Defendant JS Meyer.

7.      During the course and scope of his employment at JS Meyer, Elgin has revealed and/or disclosed Plaintiffs' trade secrets and confidential information that he acquired during his employment with Roeslein and RAE.

8.      Elgin, upon information and belief, formed a series of companies that were ultimately consolidated into Defendant EM Bioenergy.

9.      During the course and scope of his employment/association with those various companies and EM Bioenergy, Elgin has revealed and/or disclosed Plaintiffs' trade secrets and confidential information that he acquired during his employment with Roeslein and RAE.

10.     On October 15, 2014, RAE entered into a Master Services Agreement with Defendant M&K to perform engineering services for Plaintiffs.

11.     During the course and scope of the services agreement, M&K obtained Plaintiffs' confidential information and trade secrets.  M&K passed that confidential information and trade

2

secrets to the other Defendants, and with them, published and used the confidential information and trade secrets without Plaintiffs' consent.

## PARTIES

12.     Plaintiff Roeslein is a Missouri corporation with its principal place of business at 9200 Watson Rd., Suite 200, Crestwood, Missouri 63126.

13.     Plaintiff RAE is a Missouri limited liability company with its principal place of business at 9200 Watson Rd., Suite 200, Crestwood, Missouri 63126.

14.     Defendant Thomas Elgin is an individual who, upon information and belief, resides in St. Louis County, Missouri.

15.     Defendant EM Bioenergy is a Missouri corporation with its principal place of business at 23 Public Square, Suite 410, Belleville, IL and with a registered agent address of 230 S. Bemiston Avenue, Suite 730, Clayton, MO 63105.

16.     Upon information and belief, Elgin is currently employed by or associated with EM Bioenergy.

17.     Upon information and belief, during the period relevant to this lawsuit, Jason Meyer and Stanley Meyer are or were directors, employees and/or officers of EM Bioenergy.

18.     Defendant JS Meyer is a Missouri corporation with its principal place of business at 23 Public Square, Suite 410, Belleville, IL and with a registered agent address of 230 S. Bemiston Avenue, Suite 730, Clayton, MO 63105.  Upon information and belief, Elgin was and is employed by or associated with JS Meyer as its Vice-President, Chief Financial Officer, Secretary and Treasurer.

19.     Upon information and belief, Stanley Meyer is the father of Jason Meyer.

20.     Upon information and belief, during the period relevant to this lawsuit, Jason Meyer and Stanley Meyer are or were directors, employees and/or officers of JS Meyer.

21.     Defendant M&K is an Illinois corporation licensed to do business in Missouri. M&K's principal place of business is 23 Public Square, Suite 410, Belleville, Illinois 62220 and with a registered agent address of 230 S. Bemiston Avenue, Suite 730, Clayton, MO 63105.

22.     In addition to the above, upon information and belief, M&K, JS Meyer, and EM Bioenergy share common ownership, employees and/or principals.

## JURISDICTION AND VENUE

23.     This court has subject matter jurisdiction over Counts I and II of this action under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this is a civil action arising under the Constitution, laws, or treaties of the United States.  This action also arises under the Patent Laws of the United States and therefore jurisdiction is proper under 28 U.S.C. § 1338.

24.     This Court has supplemental or pendent jurisdiction over the state and common law claims under 28 U.S.C. § 1367(a) because they are so related to the claims asserted in Counts I and II that they form part of the same case or controversy.

25.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, or a substantial part of the property that is the subject of the action is situated in this judicial district.

## FACTUAL ALLEGATIONS

### Plaintiffs' Unique and Protected Proprietary Information and the Hiring of Thomas Elgin

26.     Plaintiffs incorporate, as if fully set forth herein, the allegations contained in Paragraphs 1 through 25 of the Complaint.

27.     Roeslein and RAE are affiliated entities with common ownership.

28.     Roeslein, which was founded in 1990, is an engineering company that designs and builds modular and unitized systems.

29.     On June 7, 2010, Elgin was hired by Roeslein as its Director of the Process &

4

Energy Business Unit, which was part of Roeslein's expansion into the business of renewable energy.

30.     As Director of Roeslein's Process & Energy Business Unit, Elgin was responsible for the process and energy sectors, which included directing Plaintiffs' efforts to develop a process for converting animal waste to renewable energy.

31.     During the relevant time period, Elgin became Director and Business Unit Leader for RAE, at which he had the same responsibilities and duties to both companies.

32.     Elgin's responsibilities and duties to Plaintiffs remained the same throughout the course of his employment both at Roeslein and RAE.

33.     In 2014, Elgin became a Vice President of Roeslein Alternative Energy of Missouri, LLC ("RAEM"), an affiliated entity of RAE in which RAE is the sole member.  Elgin remained employed at RAE.

34.     RAE is in the business of, among other things, renewable energy through a process that uses anaerobic digestion to convert livestock production into natural gas.  The residue from RAE's process is a natural fertilizer, which is used for prairie restoration.

35.     Roeslein and RAE have invested significant time, effort, and financial resources to refine and perfect these processes, including the construction of a plant in Northern Missouri ("the Ruckman Facility") with its partner, Murphy-Brown of Missouri ("Murphy-Brown").

36.     Murphy-Brown is a wholly owned subsidiary of Smithfield, Inc.

37.     In June of 2010, Elgin entered into an Employment Agreement with Plaintiffs that included, among other things, a confidentiality agreement.

38.     The confidentiality agreement states:

> Employee will not, except as authorized by Corporation, during and for a period of five (5) years after the termination of

5

Employee's employment with Corporation, directly or indirectly, use for himself or others, or disclose, communicate, divulge, furnish to, or convey to any other person, firm, or corporation, any secret or confidential information, knowledge or data of Corporation or that of third parties obtained by Employee during the period of his employment with Corporation (hereinafter, "Confidential Information"). Confidential Information includes, without limitation, the following:

     * Secret or confidential matters of a technical nature such as, but not limited to, methods, know-how, formulae, compositions, processes, discoveries, machines, inventions, computer programs, and similar items or research projects involving such items,
     * Secret or confidential matters of a business nature such as, but not limited to, information about costs, purchasing, profits, market, sales or lists of customers,
     * Secret or confidential matters pertaining to future developments such as, but not limited to, research and development or future marketing or merchandising, and
     * Secret or confidential matters pertaining to the unitizing or pre-assembly of systems.

Corporation may notify any person, firm, or corporation employing Employee or evidencing an intention to employ Employee as to the existence and provisions of this Agreement.

     Employee understands and acknowledges that the Inventions and the Confidential Information are unique and that the disclosure or use of such Inventions and Confidential Information other than in furtherance of the business of Corporation would reasonably be expected to result in irreparable harm to Corporation; and that in addition to whatever other remedies Corporation and/or its successors or assigns may have at law or in equity, Employee specifically covenants and agrees that, in the event of default under or breach of this Agreement, Corporation and/or its successors and assigns shall be entitled to apply to any court of competent jurisdiction to enjoin any breach, threatened or actual, of the foregoing covenants and promises by Employee, and/or to sue to obtain damages for default under or any breach of this agreement, Employee hereby agrees to pay all costs of enforcement and collection of any and all remedies and damages under this Agreement, including reasonable attorneys' fees.

39.    The Employment Agreement contained an additional provision in which Elgin

6

agreed that any inventions disclosed by Elgin within six months of his termination would be presumed to be property of the Plaintiffs:

> Any Invention disclosed by Employee to a third person or described in a patent application filed by Employee, or on Employee's behalf, within six (6) months after the date of termination of Employee's employment with Corporation shall be presumed to have been conceived or made by Employee during the period of his employment with Corporation.

40.     Some of the trade secrets or protectable proprietary information that Plaintiffs shared with Elgin in the context of their confidential business relationship included:

a.  Plaintiffs' Process Technology

Plaintiffs' Process Technology includes details and information regarding how Plaintiffs' Facilities combine biological and mechanical energy conversion to create natural biogas in a process that is significantly more efficient than that of conventional processing plants.  Plaintiffs' Process Technology also employs a proprietary process different than the parasitic methods used in conventional anaerobic digesters.

Plaintiffs' Process Technology also allows for a superior means of energy storage and transport.

b.  Facilities Overview

Elgin had access to studies of potential facilities, including Plaintiffs' proprietary modeling process for future plants and competitively sensitive information relating to: hog feeding, hog operations, environmental impact, revenue, risk, profitability and other information used to determine plant viability.

c.  Financial

Elgin had access to Plaintiffs' financial information, including but not limited to the financial impact of the various proprietary processes that Plaintiffs employs in producing natural gas and fertilizer.

41.     All of this and related trade secret information is referred to hereinafter as the "Plaintiffs' Trade Secret Information."

42.     In working for Plaintiffs, Elgin received confidential access to sensitive, proprietary and valuable scientific and technical information regarding Plaintiffs' energy solutions and restoration methodologies as well as Plaintiffs' financial information.

43.     In connection with his employment and with the construction of the Ruckman facility, Elgin received confidential, proprietary and trade secret information relating to every aspect of the operations of that facility.  In addition to the information identified above, Elgin gained access to information that included:

a.   the design of the Ruckman facility, including but not limited to detailed blueprints and schematics of the facility, cost estimates for the purchase and use of equipment necessary to transport animal waste, naturally converting animal waste to biogas and transporting biogas to end users:

b.   the scientific means to manage anaerobic digestion to create biogas

   i.   the methodology employed by Plaintiffs to maintain the necessary temperature in its lagoons to ensure the natural production of biogas;

   ii.   the means by which biogas is "scrubbed", i.e. made transportable and usable as energy;

   iii.   mechanisms to remove Hydrogen Sulfide, a necessary step in generating safe, usable biogas;

   iv.   methodologies and formulae for the balance of animal solids to liquid in the lagoons in which biogas is generated; and

   v.   estimates of organic loading and emissions rate to properly plan and size the Ruckman and future facilities.

c.   profit analyses;

8

    d.   analyses of the efficacy of various types of equipment used in the production of biogas;

    e.   comparisons of vendor proposals; and

    f.   the results of facilities testing, including but not limited to daily measurement and analysis of Plaintiffs' lagoon facility's output of biogas under various conditions.

44.    Internally, all Plaintiffs' Trade Secret Information was protected by Plaintiffs from improper disclosure or unauthorized use at all times in a manner that was fully reasonable under the circumstances, including but not limited to: limited distribution and access, employee confidentiality policies and agreements, various password protections, and other reasonable measures and safeguards directed towards the protection of Plaintiffs' proprietary information.

45.    All of Plaintiffs' Trade Secret Information shared with Elgin throughout his employment with Plaintiffs fell within the scope of the parties' agreed upon confidentiality obligations.

46.    On the basis of trust, as well as repeated assurances (both written and oral) of confidentiality, Plaintiffs provided Elgin with Plaintiffs' Trade Secret Information.  Had Elgin not agreed to these confidentiality obligations, Plaintiffs would never have entered into any agreement with Elgin and would not have revealed their Trade Secret Information and/or their proprietary and confidential data to him.

**Defendants' Actual or Inevitable Release of Plaintiffs' Proprietary Information**

47.    Plaintiffs terminated Elgin on or about January 12, 2015.

48.    Per the terms of his employment agreement, Elgin was still obligated to keep Plaintiffs' Trade Secret Information confidential.

49.    Shortly after leaving Plaintiffs' employ, Elgin began working for JS Meyer as, among other things, its Chief Financial Officer, and began using his years of intimate knowledge

9

of Plaintiffs' Trade Secret Information to compete with Plaintiffs.

50.     Elgin, along with Jason and Stanley Meyer, formed a series of entities, including EM Bioenergy that used Plaintiffs' Trade Secret Information.

51.     The Plaintiffs' Trade Secret Information Elgin gained from his work with Plaintiffs is directly relevant to any renewable energy/restoration process developed by Defendants.

52.     Elgin has used, revealed, and/or disclosed Plaintiffs' Trade Secret Information that he gained through his employment with Plaintiffs, in direct contravention of his promises of confidentiality and the restrictions imposed by the terms of the parties' agreements.

53.     Elgin has passed Confidential and Trade Secret Information to several companies, including JS Meyer, EM Bioenergy, M&K, Kolb Grading, Elgin-Kolb Bioenergy of New Mexico, Stern Brothers & Co. and Smithfield, Inc.

54.     In one instance, Elgin and the other defendants have used Plaintiffs' Trade Secret Information to assist Kolb Grading and Elgin-Kolb Bioenergy in the construction of a facility near Roswell, New Mexico.

55.     The facility near Roswell, New Mexico uses technology developed by Plaintiffs and shared with Elgin, JS Meyer, EM Bioenergy, and M&K.  Elgin and the other defendants used this technology to not only construct the New Mexico facility but also to convince individuals and companies to provide financing for the New Mexico project.

56.     In fact, JS Meyer used an RAE form agreement, right down the footer identifying it as such, as its contract with Elgin-Kolb Bioenergy of New Mexico for the construction of the New Mexico facility.

57.     During meetings with Smithfield, Inc. in May 2016, Elgin and the other

defendants shared Plaintiffs' Trade Secret Information with Smithfield, Inc. in an effort to secure a supply of livestock waste to be used at additional projects Elgin and JS Meyer were proposing that would employ Plaintiffs' Trade Secret Information.

58.     On or about June 5, 2015, JS Meyer filed a patent application with the United States Patent & Trademark Office ("USPTO") entitled "Systems and Methods for Processing Organic Compounds" ("the '420 patent application").  The specifications contained in the patent application describe a process that contains Plaintiffs' Intellectual Property and Trade Secret Information.

59.     Stanley Meyer claims to be an inventor of the process identified in the '420 patent application.

60.     The '420 patent application states it supersedes a provisional patent application filed on October 3, 2014 ("the '236 provisional patent application").

61.     Upon information and belief, Elgin passed Plaintiffs' Trade Secret Information to JS Meyer for the purpose of filing the '420 patent application.

62.     Defendants will continue to reveal, provide, disclose and/or use Plaintiffs' Trade Secret Information in the development of such process technology to the detriment of Plaintiffs if they are not enjoined from doing so.

63.     Disclosure and/or use of any of Plaintiffs' Trade Secret Information by Elgin and the other Defendants will result in irreparable harm to Plaintiffs, have a significant impact on Plaintiffs' finances, result in a substantial loss to their competitive advantage in the marketplace and puts Plaintiffs' future success in jeopardy.

**Plaintiffs' Trade Secret and Protected Proprietary Information and the Hiring of M&K**

64.     M&K is an engineering company that holds itself out as having expertise in chemical process development.

11

65.     M&K's founder is Stanley Meyer.  Upon information and belief, Stanley Meyer is the President and principal owner of M&K.

66.     M&K's Vice-President is Jason S. Meyer.  Jason Meyer is also a director, employee and/or officer of defendants JS Meyer and EM Bioenergy.

67.     On or about October 15, 2014, RAE hired M&K to perform engineering services and processes for RAEM in order to construct the Ruckman, Missouri facility.

68.     M&K and RAE entered into two agreements on that date.  The first was a Master Services Agreement.  A true and accurate copy of Defendant M&K's Master Services Agreement was previously filed with the Court as Exhibit C (ECF #48).

69.     The Master Services Agreement contained a provision in which M&K agreed that any intellectual property developed by it in the course of its work for RAE would be the property of RAE:

> 11.  **Creation of Intellectual Property.**     [M&K's]     original creation of, and all worldwide rights, titles and interests in all copyrights and other intellectual properties in and to, materials, documents and other written work, contracts, presentations, prints, designs, drawings and other work created, developed and/or modified by [M&K] in connection with this Agreement (collectively, the "Work Product"), shall be governed by this Agreement and the applicable Task Order.  Unless otherwise set forth in a Task Order or agreed in writing between the parties hereto, all Work Product is and shall be a "work for hire" and shall be the property of RAE.

70.     The second agreement was a confidentiality and non-disclosure agreement ("M&K Confidentiality Agreement").  A true and accurate copy of the M&K Confidentiality Agreement was previously filed with the Court as Exhibit D (ECF #41).

71.     The M&K Confidentiality Agreement states, among other things:

> Except as otherwise permitted by this Agreement, all

12

> Confidential Information shall be (a) maintained by Recipient in confidence, (b) will not be disclosed, transferred or otherwise made available by Recipient to any person, firm or organization, and (c) will be used by Recipient only in conjunction with the Purpose.
>
> . . .
>
> Recipient agrees to use the same degree of care, but not less than reasonable care, to safeguard the confidentiality of the Confidential Information as it uses to safeguard the confidentiality of its own confidential and proprietary information.

72.     Through M&K's agreements, both Stanley and Jason Meyer worked on the design and construction of the Ruckman facility.

73.     In working with Plaintiffs, M&K was intimately involved in the construction of the Ruckman facility, and as such received confidential access to Plaintiffs' Trade Secret Information and valuable scientific and technical information regarding Plaintiffs' energy solutions and engineering and restoration methodologies.

74.     That information included, but was not limited to:

a.    the design of the Ruckman facility, including but not limited detailed blueprints and schematics of the facility, cost estimated for the purchase and use of equipment necessary to transport animal waste, naturally converting animal waste to biogas and transporting biogas to end users;

b.    the scientific means to manage anaerobic digestion to create biogas

   i.    the methodology employed by Plaintiffs to maintain the necessary temperature in its lagoons to ensure the natural production of biogas;

   ii.    the means by which biogas is "scrubbed", i.e. made transportable and usable as energy;

   iii.    mechanisms to remove Hydrogen Sulfide, a necessary step in generating safe, usable biogas;

     iv.   methodologies and formulae for the balance of animal solids to liquid in the

         lagoons in which biogas is generated; and

     v.   estimates of organic loading and emissions rate to properly plan and size the

         Ruckman and future facilities;

   c.   profit analyses;

   d.   analyses of the efficiency of various types of equipment used in the production of

      biogas;

   e.   comparisons of vendor proposals; and

   f.   the results of facilities testing, including but not limited to daily measurement and

      analyses of Plaintiffs' lagoon facility's output of biogas under various conditions.

75.     All of Plaintiffs' Trade Secret Information shared with M&K throughout the duration of its M&K Confidentiality and Master Services Agreements fell within the scope of the parties' agreed upon confidentiality obligations.

76.     On the basis of trust, as well as repeated assurances (both written and oral) of confidentiality, Plaintiffs provided M&K with Plaintiffs' Trade Secret Information.  Had M&K not agreed to these confidentiality obligations, Plaintiffs would never have entered into any agreement with M&K and would not have revealed their Trade Secret Information and/or their proprietary and confidential data to them.

### Defendants' Filing and Alleged Ownership of U.S. Patent Application 2016/0096761

77.     The '420 patent application generally discloses and claims a system and method for processing manure and other organic compounds in anaerobic vessels to provide for improved odor control.

78.     The USPTO identifies the '420 patent application as U.S. Patent Application 2016/0096761 (or "U.S. Application").

79.     In addition, Defendants filed a Patent Cooperation Treaty (PCT) Application, identified as International Application No. PCT/US2015/054076, which published on or about April 7, 2016, claiming priority to the U.S. Application and an earlier U.S. provisional application.  By this filing, Defendants have confirmed that they intend to expand the scope of their patent monopoly, if granted, to numerous countries around the world.

80.     At a certain point during the prosecution of United States patents, the USPTO publishes the pending patent application to the public.  The date of publication is typically the first date the public can know that an application has been filed and can access information contained in the application.

81.     Here, the USPTO published the U.S. Application on or about April 7, 2016.  A true and accurate copy of the published U.S. Application was previously filed with the Court as Exhibit A (ECF #41).

82.     Upon their discovery and review of the published application, Plaintiffs learned that their research and development, products, processes, confidential and proprietary information, and inventions ("Plaintiffs' Intellectual Property") were disclosed and/or claimed in the U.S. Application.

83.     Upon information and belief, JS Meyer intentionally, negligently, or erroneously and without deceptive intent alleged it was the owner of the inventions disclosed or claimed in the U.S. Application.

84.     Rudolph Roeslein, co-founder and CEO of Roeslein and RAE, is the true inventor of the inventions disclosed or claimed in the U.S. Application.  At the time of the invention, Mr. Roeslein was developing a process using anaerobic digestion to convert livestock waste into natural gas.

15

85.     Upon information and belief, Defendants purport to specialize in "clean water for the chemical industry and the Oil/Gas industry".

86.     Defendants' U.S. Application, claiming ownership of "Systems and Methods for Processing Organic Compounds" strays far outside Defendants' usual area of purported expertise.

87.     The presence of Plaintiffs' Intellectual Property in the U.S. Application, JS Meyer's employment of former Roeslein Director Thomas Elgin, and the short time period between Defendant Elgin's January 12, 2015 termination by Plaintiffs and subsequent employment by JS Meyer, demonstrates, upon information and belief, Defendant Elgin improperly provided Plaintiffs' Intellectual Property to his new employers EM Bioenergy and JS Meyer.

88.     During all times relevant to this complaint, Defendant Elgin assigned his rights to any intellectual property, including patent rights, to Plaintiffs.  A true and accurate copy of Defendant Elgin's Employment Agreement was previously filed with the Court as Exhibit B (ECF #48).

89.     During all times relevant to this complaint, Defendant M&K assigned its rights to any intellectual property, including patent rights, to Plaintiffs.

90.     Further, Plaintiffs are the true owners of U.S. Application 2016/0096761 because it contains Plaintiffs' Intellectual Property improperly disclosed by Thomas Elgin and M&K to EM Bioenergy and JS Meyer, in violation of Defendant Elgin's Employment Agreement.

91.     Because of the confidential nature of patent prosecution in the United States, it is possible that Defendants have filed other patent applications, continuation applications, or continuation-in-part applications, claiming Plaintiffs' Intellectual Property, but Plaintiffs do not

16

have access to them.

92.     Defendants have continued to prosecute the U.S. Application with the aim of securing a U.S. Patent, despite the fact it discloses and/or claims Plaintiffs' Intellectual Property, and is based upon Thomas Elgin's and M&K's improper disclosure of Plaintiffs' Intellectual Property to EM Bioenergy and JS Meyer.

93.     As part of the continuing prosecution, the examiner assigned to review the U.S. Application issued on June 29, 2017, a Final Office Action rejecting Claims 1-35 of the application under 35 U.S.C. § 102 and/or § 103.

94.     Thus, Defendants' improper actions have irreparably harmed Plaintiffs by divulging Plaintiffs' Intellectual Property to the public.

95.     Defendants' improper actions require Plaintiffs to move to protect what remaining value Plaintiffs' Intellectual Property may have left through the patenting process.  Plaintiffs no longer have the option to protect Plaintiffs' Intellectual Property by other conventional means, such as keeping it a trade secret or otherwise.

96.     Defendants' improper actions in failing to properly prosecute the U.S. Application have caused additional irreparable harm to Plaintiffs.

97.     Defendants' improper actions may have imperiled the prosecution of the U.S. Application because the assigned USPTO Examiner may locate and assert prior art (generally defined as evidence the claimed invention was already known, usually in the form of patents, printed publications, and inventions available to the public, before a critical date) against the application under 35 U.S.C. § 102 and/or § 103 that would not otherwise have been available to the Examiner.

98.     Finally, the ability of Plaintiffs to monetize the patent rights once issued has been

17

permanently decreased, if not eliminated, in that they may be unable to license the patent to others in the industry, or enforce the patent in litigation, given Defendants' improper actions in filing the application and during patent prosecution, including, but not limited to, the improper claims of patent ownership.

99.     If this Court does not enjoin Defendants from their continued improper actions, and assign the U.S. Application to Plaintiffs so that it can be prosecuted properly, it is likely that the value of the patent will be permanently decreased, if not eliminated completely.

100.     Subsequent to the date Plaintiffs filed their motion to amend the complaint (ECF #40 – July 21, 2017), the Meyers filed an Information Disclosure Statement with the USPTO.

101.     In the December 28, 2017 Information Disclosure Statement, the Meyers submitted a patent disclosure document from Stanley M. Meyer, dated October 2, 1997, and certain pleadings and documents from this Court's ECF Docket in this action.

102.     The USPTO did not make a determination that the Meyers were the true inventors of any inventions disclosed or claimed in the '420 application based upon the submission of the Information Disclosure Statement.

103.     The USPTO did not make a determination that the 1997 patent disclosure document supports the claims of the '420 application.

104.     Because the '420 application does not claim priority to the 1997 provisional application, the Meyers did not claim to the USPTO that the 1997 provisional application supports the '420 application.  The subject matter of the '420 application is different than that in the 1997 provisional application.

105.     The 1997 provisional lists Stanley M. Meyer as the sole inventor, while the '402 application lists both Stanley M. Meyer and Jason S. Meyer as inventors.  This necessarily means

that the subject matter of '402 application goes beyond that of the 1997 provisional resulting in the requirement to list the additional inventor.

106.    In a non-final rejection dated on or about January 26, 2018, the USPTO allowed certain claims of the '420 application, and rejected or objected to others.  Specifically, claims 1-3, 5, 6, 9-12, 15-18, 20, 21, 24-26, 28, 31, and 34 were allowed.  Claims 29, 37-39, 43, and 44 were rejected, and claims 32, and 40-42 were objected to.

107.    Defendants continue to prosecute the '420 application which contains Plaintiffs' Intellectual Property and Trade Secret Information, obtained from Plaintiffs' protected disclosures to Elgin and/or M&K.

108.    Plaintiffs are the true owner of the inventions disclosed and/or claimed in the '420 application.

**Count I – Misappropriation of Trade Secrets Under the Federal Defend Trade Secrets Act**

109.    Plaintiffs incorporate Paragraphs 1 through 108 as if fully stated herein.

110.    Plaintiffs have taken reasonable measures to keep their Trade Secret Information secret.

111.    Plaintiffs derive significant economic value, both actual and potential, from their Trade Secret Information not being generally known to, nor readily ascertainable by, other individuals or companies in the industry who could derive significant economic value from their disclosure or use of the information.

112.    Plaintiffs' Trade Secret Information, their confidential processes and facilities relate to products and/or services (Plaintiffs' processes and business information) that are used in, or intended for use in, interstate and foreign commerce.

113.    Plaintiffs' Trade Secret Information has been used, released or disclosed by Defendants through improper means, with an improper purpose, and in conflict with the business

19

interests of Plaintiffs, without the consent or authorization of Plaintiffs and without lawful justification.

114.     At the time of use, release, and/or disclosure, Defendant Elgin knew or had reason to know that his knowledge of Plaintiffs' secrets was acquired under circumstances giving rise to a duty to maintain its secrecy and/or limit its use.

115.     At the time of use, release, and/or disclosure, Defendant M&K knew or had reason to know that its knowledge of Plaintiffs' secrets was acquired under circumstances giving rise to a duty to maintain its secrecy and/or limit its use.

116.     At the time of use, release, and/or disclosure, Plaintiffs JS Meyer and EM Bioenergy knew or had reason to know that knowledge of Plaintiffs' secrets was derived through Defendants Elgin and M&K, who each owed a separate duty to Plaintiffs to maintain its secrecy and/or limit its use.

117.     Defendants took such actions willfully, and/or in reckless disregard for Plaintiffs' rights, in that Defendants knew, or had reason to know, that they were not authorized to use Plaintiffs' Trade Secret Information in competition with Plaintiffs.

118.     Defendants took such actions willfully, and/or in reckless disregard for Plaintiffs' rights, in that Defendants knew, or had reason to know, that they were not authorized to use Plaintiffs' Trade Secret Information in competition with Plaintiffs outside the scope of M&K's Service Agreement.

119.     Defendants' misappropriation of Plaintiffs' Trade Secret Information is continuing and ongoing.  And upon information and belief, Elgin continues to give presentations in the industry in which he pitches his knowledge of biogas production, obtained from the misappropriation of Plaintiffs' Trade Secret Information, including in a recent pitch in or about

August, 2017.

120.    As a result of Defendants' misappropriation of Plaintiffs' Trade Secret Information, Plaintiffs will suffer actual losses in an amount to be determined at trial.  Plaintiffs will also suffer irreparable harm if Defendants' misconduct is not enjoined.

121.    Pursuant to 18 U.S.C. § 1836(b)(3)(C), Plaintiffs are entitled to exemplary damages for Defendants' willful and malicious misappropriation of Plaintiffs' Trade Secret Information.

122.    Pursuant to 18 U.S.C. § 1836(b)(3)(D), Plaintiffs are entitled to recovery of their attorney's fees because of Defendants' willful and malicious misappropriation of Plaintiffs' Trade Secret Information.

**Count II – Declaratory Judgment of Ownership of U.S. Application No. 2016/0096761**

123.    Plaintiffs incorporate Paragraphs 1 through 122 as if fully stated herein.

124.    As a result of Defendants' improper actions, there is a substantial and continuing justiciable controversy between Plaintiffs and Defendants concerning ownership of U.S. Application No. 2016/0096761 (including any patents, U.S. or foreign, issuing from or deriving from the U.S. Application and/or Plaintiffs' Intellectual Property) and the right to control the remaining prosecution of the U.S. Application.

125.    Pursuant to 28 U.S.C. § 2201 *et seq*., Plaintiffs seek a declaratory judgment that they own U.S. Application No. 2016/0096761, as well as any patent applications and/or patents, U.S. or foreign, issuing from or deriving from the U.S. Application and/or Defendants' improper possession of Plaintiffs' Intellectual Property.

126.    Upon information and belief, Elgin disclosed Plaintiffs' Intellectual Property to Stanley and Jason Meyer, the purported inventors named in the '420 Patent application and principals of JS Meyer.  Because JS Meyer filed the '420 Patent application less than six months

after Elgin's separation from Plaintiffs, by operation of Elgin's Employment Agreement, the '420 Patent application is "presumed to have been conceived or made by [Elgin] during the period of his employment with [Roeslein]."

127.    Upon information and belief, M&K disclosed Plaintiffs' Intellectual Property to Stanley and Jason Meyer.  JS Meyer filed the '420 Patent application less than one year after the M&K Services and Confidentiality Agreements began, which required Plaintiffs' confidential information not to be disclosed or otherwise made available by M&K to Defendants.

128.    Upon information and belief, as a result of Defendants' improper actions in filing and prosecuting U.S. Application No. 2016/0096761, based in whole or in part on Plaintiffs' Intellectual Property obtained by Defendant Thomas Elgin during the course of his employment with Plaintiffs and Defendant M&K during the course of its Master Service Agreement, whether negligently, intentionally, or erroneously and without deceptive intent, and pursuant to their contractual obligations, Plaintiffs are the rightful owners of all patentable subject matter disclosed and/or claimed therein, pursuant to the Patent Laws of the United States and Missouri law.

129.    By reason of Defendants' alleged improper actions, Plaintiffs have been and will continue to be irreparably harmed if Defendants are permitted to continue to control the prosecution of U.S. Application No. 2016/0096761.  Plaintiffs should be allowed to control such prosecution as the true and rightful owners of the U.S. Application; further and alternatively, Plaintiffs seek a declaration and order that Defendants assign all their rights or ownership interest in the U.S. Application to Plaintiffs, as well as any foreign patents issuing from or deriving from the U.S. Application and/or Plaintiffs' Intellectual Property.

130.    As a result of Defendants' actions, Plaintiffs have been irreparably harmed and

damaged and will continue to be unless Defendants are enjoined by the Court.

131.    Plaintiffs have no adequate remedy at law.

**<u>Count III – Breach of the Missouri Uniform Trade Secrets Act</u>**

132.    Plaintiffs incorporate Paragraphs 1 through 131 as if fully stated herein.

133.    All of the Plaintiffs' Trade Secret Information constitutes protectable trade secret information belonging solely to Plaintiffs.

134.    Plaintiffs derive significant economic value, both actual and potential, from the Plaintiffs' Trade Secret Information not being generally known to, nor readily ascertainable by, other individuals or companies in the industry who could derive significant economic value from its disclosure or use of the information.

135.    The Plaintiffs' Trade Secret Information is not information that is generally known outside of Plaintiffs' businesses.

136.    Plaintiffs' Trade Secret Information, as identified and described herein, is not generally and commonly known by Plaintiffs' employees and is subject to reasonable efforts to maintain its confidentiality through restricted access, limited disclosure, agreed confidentiality, password protections, and other safeguarding measures.

137.    Plaintiffs have expended significant time, effort, and financial resources in obtaining and developing the Plaintiffs' Trade Secret Information over many years; the amount of time and expense that it would take for a competitor to independently acquire or duplicate the knowledge and information possessed by Plaintiffs would be significant.

138.    Plaintiffs' Trade Secret Information was shared with and acquired by Plaintiffs Elgin and M&K under the auspices of trust, promises of non-disclosure, and in the context of the parties' confidential relationship.

139.    Both Elgin and M&K were aware of the existence, value and secret nature of the

Plaintiffs' Trade Secret Information.

140.    The Plaintiffs' Trade Secret Information has been used, released or disclosed by Elgin and M&K through improper means, with an improper purpose, and in conflict with the business interests of Plaintiffs, without the consent or authorization of Plaintiffs and without lawful justification.

141.    Defendants' unlawful misappropriation and release of Plaintiffs' Trade Secret Information has already had a significant negative financial impact to Plaintiffs' businesses.

142.    Plaintiffs will continue to suffer irreparable financial harm and damage if the misappropriation is not enjoined.

### Count IV – Breach of Contract – Elgin

143.    Plaintiffs incorporate Paragraphs 1 through 142 as if fully stated herein.

144.    Elgin signed and entered into an Employment Agreement with Plaintiffs that included, among other things, a confidentiality agreement.

145.    Elgin worked as Director for Roeslein and RAE for over five years, where he regularly acted on behalf of Plaintiffs.

146.    Plaintiffs honored the parties' Employment Agreement.

147.    Plaintiffs gave valuable consideration in exchange for Defendant Elgin's obligation not to disclose Plaintiffs' Trade Secret Information.

148.    Defendant Elgin breached agreements with Plaintiffs by later disclosing Plaintiffs' Trade Secret Information that he acquired during his employment with Plaintiffs.

149.    Defendants' unlawful disclosure and release of Plaintiffs' Trade Secret Information has already caused a significant negative financial impact to Plaintiffs' business and Plaintiffs continue to suffer irreparable financial harm and damage.

### Count V – Breach of Fiduciary Duty - Elgin

24

150.    Plaintiffs incorporate Paragraphs 1 through 149 as if fully stated herein.

151.    As Director for Roeslein and RAE and as Vice President of RAEM, Defendant Elgin owed Plaintiffs a fiduciary duty, which included a duty to act and give advice for its benefit, to act in good faith and in its best interests, to exercise independent professional judgment and undivided loyalty on their behalf, to pursue their lawful objectives, to represent no adverse interests and to make full disclosure to Plaintiffs in a timely fashion of all known information that was important and material to the corporations' affairs.

152.    Plaintiffs' Trade Secret Information was shared with and acquired by Elgin under the auspices of trust, promises of non-disclosure, and in the context of the parties' confidential relationship.

153.    The Plaintiffs' Trade Secret Information was to be used solely for the purposes of supporting and developing Plaintiffs' businesses.

154.    Instead, Elgin has breached his duty as  Plaintiffs' Trade Secret Information has been used, released or disclosed through improper means, with an improper purpose, and in conflict with the business interests of Plaintiffs, without the consent or authorization of Plaintiffs and without lawful justification.

155.    Defendant's unlawful misappropriation and release of Plaintiffs' Trade Secret Information has already caused a significant negative financial impact to Plaintiffs' business and Plaintiffs continue to suffer irreparable financial harm and damage.

### Count VI – Breach of Contract – M&K

156.    Plaintiffs incorporate Paragraphs 1 through 155 as if fully stated herein.

157.    Stanley Meyer, on behalf of M&K, signed and entered into the M&K Confidentiality Agreement with Plaintiff RAE.

158.    Per the Master Services Agreement, M&K performed services and was provided

25

access to Plaintiffs' facilities and its confidential and Trade Secret Information.

159.    RAE fully complied with the parties' Master Services and M&K Confidentiality Agreements.

160.    Plaintiffs gave valuable consideration in exchange for Defendant M&K's obligation not to disclose Plaintiffs' Trade Secret Information.

161.    Defendant M&K breached agreements with Plaintiffs by later disclosing Plaintiffs' Trade Secret Information that it acquired during and within the scope of the Master Services Agreement.

162.    Defendants' unlawful disclosure and release of Plaintiffs' Trade Secret Information has already caused a significant negative financial impact to Plaintiffs' business and Plaintiffs continue to suffer irreparable financial harm and damage.

## **Prayer for Relief**

WHEREFORE, Plaintiffs Roeslein & Associates, Inc. and Roeslein Alternative Energy, LLC request that this Court enter judgment in their favor and against Defendants for the following:

A.    A preliminary and permanent injunction restraining Defendants, their employees, agents, representatives, and all persons in participation with Defendants, from:

   a.    making, using, offering for sale, or selling the inventions disclosed and/or claimed in U.S. Application No. 2016/0096761;

   b.    prosecuting U.S. Application 2016/0096761 or, alternatively, from allowing the U.S. Application to issue or to become abandoned without filing a continuation application or other timely, complete filing in order to protect any remaining patentable subject matter Plaintiffs may be able to secure;

B.    A preliminary and permanent injunction ordering Defendants, their employees, agents, representatives, and all persons in participation with

26

Defendants:

    a.  to assign all rights they may have in U.S. Application No. 2016/0096761 to Plaintiffs;

    b.  from representing that they are the owners of U.S. Application No. 2016/0096761 and/or the Intellectual Property disclosed and/or claimed in the U.S. Application;

    c.  from disclosing any remaining Plaintiffs' Intellectual Property to the public; and,

C.    A preliminary and permanent injunction placing U.S. Application No. 2016/0096761 in a constructive trust for the benefit of Plaintiffs so that it may control the prosecution of the application.

D.    A preliminary and permanent injunction ordering Elgin to abide by the terms of his agreement with Plaintiffs, including, but not limited to:

    a.  Prohibiting Elgin from directly or indirectly using or disclosing Plaintiffs' trade secret and other confidential information; and

    b.  Prohibiting Elgin from directly or indirectly divulging or otherwise making any use of Plaintiffs' confidential information or trade secrets.

E.    A preliminary and permanent injunction ordering M&K to abide by the terms of its agreement with Plaintiffs, including, but not limited to:

    a.  Prohibiting M&K from directly or indirectly using or disclosing Plaintiffs' trade secret and other confidential information; and

    b.  Prohibiting M&K from directly or indirectly divulging or otherwise making any use of Plaintiffs' confidential information or trade secrets.

F.    Enter a preliminary and permanent injunction ordering Defendants JS Meyer and Elgin Meyer Bioenergy to:

    a.  Cease and desist from acting in concert with, engaging in, tolerating willfully, acquiescing in, or accepting Elgin's violation of his confidentiality obligations to Plaintiffs;

    b.  Cease and desist from acting in concert with, engaging in, tolerating willfully, acquiescing in, or accepting M&K's violation of its confidentiality obligations to Plaintiffs;

    c.  Cease and desist from directly or indirectly using or disclosing

27

Plaintiffs' trade secret and confidential information.

G.    Enter a preliminary and permanent injunction ordering Defendants to:

    a.    Return to Plaintiffs any and all trade secret and confidential information in custody, control or possession of any Defendant including but not limited to, information relating to Plaintiffs' Process Technology, Facilities Overview, plans and financial information.

    b.    Identify any of Plaintiffs trade secret or confidential information that has been disclosed by anyone and the names of any individual to whom such a disclosure was made; and

    c.    Preserve and retain all documents and electronically stored information potentially relevant to the claims raised in Plaintiffs' Complaint.

H.    Judgment in their favor on all Counts;

I.    An award of damages in an amount to be proven as to each Count at trial;

J.    Costs, expenses, and attorneys' fees associated with the prosecution of this action;

K.    Pre-judgment and post-judgment interest;

L.    Punitive damages on Counts I, IV, and VI; and

M.    All other relief to which Plaintiffs may be entitled.

Respectfully submitted,

THOMPSON COBURN LLP

By  /s/ Michael L. Nepple
    Steven M. Sherman, 47842MO
    Michael L. Nepple, 42082MO
    Aaron W. Banks, 67087MO
    One US Bank Plaza
    St. Louis, Missouri  63101
    314-552-6000 / FAX 314-552-7000
    ssherman@thompsoncoburn.com
    mnepple@thompsoncoburn.com
    abanks@thompsoncoburn.com

    Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system this 19th day of March, 2018 to:

Thomas Elgin (by U.S. Mail only)
31 Elderwood Court
Fenton, MO 63026

Daniel A. Tallitsch
BAKER & McKENZIE LLP
300 East Randolph Street, Suite 5000
Chicago, Illinois 60601
Tel: (312) 861-8024
daniel.tallitsch@bakermckenzie.com

*Attorney for Defendants Elgin Meyer Bioenergy Co. and*
*J.S. Meyer Engineering, P.C.*

    /s/ Michael L. Nepple