UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROESLEIN & ASSOCIATES, INC. and | ) | |
| ROESLEIN ALTERNATIVE ENERGY, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:17 CV 1351 JMB |
| | ) | |
| THOMAS ELGIN, ELGIN MEYER | ) | |
| BIOENERGY CO., J.S. MEYER | ) | |
| ENGINEERING, P.C., and M&K CHEMICAL | ) | |
| ENGINEERING CONSULTANTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants Elgin Meyer Bioenergy Co. ("EMB") and

J.S. Meyer Engineering, P.C.'s ("JSME") (collectively "Meyer Defendants") Motion to Dismiss

the First Amended Complaint (ECF No. 85) and M&K Chemical Engineering Consultants, Inc.'s

("M&K") (all Defendants collectively "Defendants") Motion to Dismiss the First Amended

Complaint (ECF No. 105).[1]  Plaintiffs Roeslein & Associates, Inc. ("Roeslein") and Roeslein

Alternative Energy, L.L.C. ("RAE") (collectively "Plaintiffs") filed opposition thereto.  The

Court heard oral argument on October 3, 2018, and the motions are fully briefed and ready for

disposition.  For the reasons set forth below, the Court grants in part and denies in part

Defendants' motions to dismiss.

## I.     Background

On March 19, 2018, Plaintiffs filed their First Amended Complaint ("FAC") naming

---

[1] M&K joined in Meyer Defendants' motion to dismiss as directed to Counts I, II, and III (ECF No. 105) but also asserted additional argument in support of dismissal of those counts and Count VI.

Thomas Elgin ("Elgin"),[2] Meyer Defendants, and M&K, alleging misappropriation of trade secrets under the Federal Defend Trade Secrets Act ("DTSA") (Count I), declaratory judgment of ownership of U.S. Patent Application No. 2016/0096761, entitled Systems and Methods for Processing Organic Compounds ("420 patent application") (Count II), breach of the Missouri Uniform Trade Secrets Act ("MUTSA") (Count III), breach of contract by Elgin (Count IV), breach of fiduciary duty by Elgin (Count V), and breach of contract by M&K (Count VI) (ECF No. 76). On March 28, 2018, Elgin filed an Answer to all counts, denying all the allegations contained in the FAC.

The factual bases for Plaintiffs' claims stem from confidential trade secret information Plaintiffs' shared with Elgin during his employment with Roeslein and RAE and thereafter JSME. Plaintiffs allege that following Elgin's termination from RAE, he passed RAE's confidential and trade secret information to EMB, JSME, and M&K, resulting in significant negative financial impact.

Also, on October 15, 2014, RAEM entered into a Master Services Agreement ("MSA") with M&K to perform engineering services. The MSA included a confidentiality provision, a non-use provision, and an intellectual property provision. Plaintiffs allege that they provided M&K with confidential information and trade secrets and that M&K improperly disclosed that information.

On June 5, 2015, JSME filed a patent application entitled, Systems and Methods for Processing Organic Compounds ("420 patent application"), describing a process allegedly containing Plaintiffs' intellectual property and trade secret information, and setting forth a system and method for processing manure and other organic compounds in anaerobic vessels

_____

[2] Elgin did not file a motion to dismiss or join in the other Defendants' motions to dismiss but instead filed an Answer (ECF No. 79) to all counts set forth in the FAC.

with improved odor control. The 420 patent application superseded a provisional patent application.[3] The United States Patent & Trademark Office ("USPTO") published the 420 patent application on April 7, 2016. Plaintiffs learned that their confidential and proprietary information and inventions were disclosed and/or claimed in the 420 patent application after it was published. Plaintiffs allege that Defendants filed a Patent Cooperation Treaty Application on April 7, 2016, claiming priority to an earlier provisional patent application.

After Plaintiffs filed their motion to amend the complaint, Meyer Defendants filed an Information Disclosure Statement with the USPTO and submitted a patent disclosure document from Stanley Meyer dated October 2, 1997 ("1997 Invention Disclosure"), listing Stanley Meyer as the sole inventor of the matter disclosed. Plaintiffs allege that the USPTO did not make a determination that the 1997 Invention Disclosure supports the claims of the 420 patent application or that the Meyers were the inventors of any inventions disclosed or claimed in the 420 patent application based on this submission. Plaintiffs allege that because the 420 patent application does not claim priority to the 1997 provisional application, Meyers Defendants did not claim to the USPTO that the 1997 provisional application supports the 420 patent application. Plaintiffs further allege that the subject matter of the 420 patent application is different than the 1997 provisional application. Plaintiffs also allege that because the 1997 provisional patent application lists only Stanley Meyer as the inventor and the 420 patent application lists both Stanley and Jason Meyers as inventors, the subject matter of the 420 patent application goes beyond the 1997 provisional application.

Meyer Defendants and M&K seek dismissal of this action pursuant to Rule 12(b)(1),

---

[3] As noted by Meyer Defendants, the FAC does not include any allegation that the provisional patent application, filed on October 3, 2014, contained Plaintiffs' trade secrets. The provisional patent application purportedly describes the same two stage anaerobic digestion process as the 1997 Invention Disclosure. (ECF 86-3 at 1-3)

alleging that the Court lacks subject matter jurisdiction, and Rule 12(b)(6), alleging that Plaintiffs have failed to state any claims for relief.

## II.    <u>First Amended Complaint</u> (ECF No. 76)

For purposes of the motions now before the Court, the record set forth in the First Amended Complaint (ECF No. 76) establishes the following facts:[4]

### A.  Elgin's Employment with Plaintiffs

Plaintiffs develop and design energy production facilities that use agricultural and industrial wastes to create green renewable alternate energy solutions to help landowners promote ecological and economic sustainability and restore native prairie lands.  (ECF No. 76, FAC at ¶¶ 1-2)  RAE is in the business of renewable energy through a process using anaerobic digestion to convert livestock waste into natural gas.  (<u>Id.</u> at ¶ 34)  Roeslein is an engineering company that designs and builds modular and unitized systems.  (<u>Id.</u> at ¶ 28)  Roeslein and RAE are affiliated entities with common ownership.  (<u>Id.</u> at ¶ 29)  Plaintiffs, with their partner, Murphy-Brown of Missouri, a wholly owned subsidiary of Smithfield, Inc., invested significant financial resources to refine and perfect these processes, including the construction of a facility located in northern Missouri referred to in this matter as "the Ruckman facility."  (<u>Id.</u> at ¶¶ 35-36)

On June 7, 2010, Roeslein hired Elgin as the Director of the Process & Energy Business Unit.  Elgin's job duties included assisting in the development of renewable energy facilities, new technology methods, and energy solutions, including heading Plaintiffs' efforts to develop a process for converting animal waste to energy.  (<u>Id.</u> at ¶¶ 4, 29-30)  During his employment with

---

[4] For purposes of ruling on the motions, the Court accepts as true the allegations in the FAC and construes the FAC in Plaintiffs' favor.  <u>See</u>, <u>e.g.</u>, <u>Warth v. Seldin</u>, 422 U.S. 490, 501 (1975); <u>Cole v. Homier Dist. Co., Inc.</u>, 599 F.3d 856, 861 (8th Cir. 2010).

Roeslein, Elgin became RAE's Director and Business Unit Leader, and his job duties and responsibilities remained the same. In 2014, Elgin became Vice President of Roeslein Alternative Energy of Missouri, LLC ("RAEM"), an affiliated entity of RAE. RAE is the sole member of RAEM. (Id. at ¶¶ 5, 32-33)

During his employment, Elgin had confidential access to proprietary scientific and technical information regarding Plaintiffs' energy solutions, restoration methodologies, and finances. (Id. at ¶ 42) During the construction of the Ruckman facility, Elgin received confidential, proprietary and trade secret information relating to the operations of that facility. In addition to the design of the facility, Elgin also had confidential access to the scientific means to manage anaerobic digestion to create biogas, the profit analysis, the equipment analysis, the vendor proposals, and the results of testing, including analysis of biogas output under various conditions. (Id. at ¶ 43) Plaintiffs assert that their trade secret information was protected from improper disclosure or unauthorized use in a reasonable manner by limited distribution and access, confidentiality agreements and policies, and password protections. (Id. at ¶ 44)

Elgin entered into an Employment Agreement with Roeslein dated June 7, 2010, that included Confidential Information and Ownership of Inventions provisions. (Id. at ¶¶ 37, 39) The Confidential Information provision provides as follows:

> Employee will not, except as authorized by [Roeslein], during and for a period of five (5) years after the termination of [Elgin's] employment with [Roeslein], directly or indirectly, use for himself or others, or disclose, communicate, divulge, furnish to, or convey to any other person, firm, or corporation, any secret or confidential information, knowledge or data of [Roeslein] or that of third parties obtained by [Elgin] during the period of his employment with [Roeslein] (hereinafter, "Confidential Information"). Confidential information includes, without limitation, the following:
> * Secret or confidential matters of a technical nature such as, but not limited to, methods, know-how, formulae, compositions, processes, discoveries, machines, inventions, computer programs, and similar items or research projects involving such items,

* Secret or confidential matters of a business nature such as, but not limited to, information about costs, purchasing profits, market, sales or lists of customers,

* Secret or confidential matters pertaining to future developments such as, but not limited to, research and development or future marketing or merchandising, and

* Secret or confidential matters pertaining to the unitizing or pre-assembly of systems.

[Roeslein] may notify any person, firm, or corporation employing [Elgin] or evidencing an intention to employ [Elgin] as to the existence and provision of this Agreement.

[Elgin] understands and acknowledges that the Inventions and the Confidential Information are unique and that the disclosure or use of such Inventions and Confidential Information other than in furtherance of the business of [Roeslein] would reasonably be expected to result in irreparable harm to [Roeslein]; and that in addition to whatever other remedies [Roeslein] and/or its successors or assigns may have at law or in equity, [Elgin] specifically covenants and agrees that, in the event of default under or breach of this Agreement, [Roeslein] and/or its successors and assigns shall be entitled to apply to any court of competent jurisdiction to enjoin any breach, threatened or actual, of the foregoing covenants and promises by [Elgin], and/or to sue to obtain damages for default under or any breach of this Agreement, [Elgin] hereby agrees to pay all costs of enforcement and collection of any and all remedies and damages under this Agreement, including reasonable attorneys' fees.

(Id. at ¶ 38, ECF No. 48-1, Employment Agreement: Confidential Information at 6)

The Ownership of Inventions provision provides as follows:

Any Invention disclosed by [Elgin] to a third person or described in a patent application filed by [Elgin], or on [Elgin's] behalf, within six (6) months after the date of termination of [Elgin's] employment with [Roeslein] shall be presumed to have been conceived or made by [Elgin] during the period of [Elgin's] employment with [RAE].

(Id. at ¶ 39; Employment Agreement: Ownership of Inventions at 6)

Plaintiffs allege that they shared the following trade secrets, or protectable proprietary information, with Elgin during his employment:

- process technology, such as details and information regarding how Plaintiffs' facilities combine biological and mechanical energy conversion to create natural biogas in a significantly more efficient process than conventional processing plants and different from the parasitic methods used in conventional anaerobic digesters;

- facilities overview information, such as studies of the proprietary modeling process for future plants and competitively sensitive information relating to hog feeding and operations, environmental impact, revenue, risk, profitability and other information used to determine plant viability; and

- financial information, such as financial impact of the various proprietary processes used by Plaintiffs in producing natural gas and fertilizer.

(collectively referred to as Plaintiffs' "trade secret information") (Id. at ¶ 40).

**B. Elgin's Employment with JSME**

On January 12, 2015, Elgin left his employment at Roeslein and began working for JSME as Vice-President, Chief Financial Officer, Secretary, and Treasurer. (Id. at ¶¶ 6, 18, 47, 49) Elgin, along with Jason and Stanley Meyer, formed EMB using Plaintiffs' confidential and trade secret information and also shared this information with JSME, EMB, M&K, Kolb Grading, Elgin-Kolb Bioenergy of New Mexico, Stern Brothers & Co., and Smithfield, Inc. (Id. at ¶¶ 17, 50, 53) Plaintiffs allege that Kolb Grading and Elgin-Kolb Bioenergy used Plaintiffs' trade secret information to construct a facility near Roswell, New Mexico, and to obtain financing for that project, and that the Roswell facility uses technology developed by Plaintiffs. (Id. at ¶¶ 54-56)

In May 2016, Elgin and JSME shared Plaintiffs' trade secret information with Smithfield, Inc., in an effort to secure a supply of livestock waste for use in other proposed projects. (Id. at ¶ 57)

**C. Hiring of M&K**

M&K is an engineering company with expertise in chemical process development. (Id. at ¶ 64) Stanley Meyer is the principal owner of M&K. Jason Meyer is the President of M&K and

also the director, employee and/or officer of JSME and EMB.  (Id. at ¶¶ 65-66)  M&K, JSME, and EMB share common ownership, employees, and/or principals.  (Id. at ¶22)

On October 15, 2014, RAE hired M&K to perform engineering services and processes for RAEM and to assist in the design and the construction of the Ruckman facility.  (Id. at ¶¶ 67, 72)  M&K and RAEM entered into a Master Services Agreement and Confidentiality and Nondisclosure Agreement ("MSA") on that date.  (Id. at ¶¶ 69, 71, Exhs C and D)  The MSA included a Creation of Intellectual Property provision.  (Id. at ¶ 69)  The Creation of Intellectual Property provision provides as follows:

> **Creation of Intellectual Property**.  [M&K's] original creation of, and all worldwide rights, titles and interests in all copyrights and other intellectual properties in and to, materials, documents and other written work, contracts, presentations, prints, designs, drawings and other work created, developed and/or modified by [M&K] in connection with this Agreement (collectively, the "Work Product"), shall be governed by this Agreement and the applicable Task Order.  Unless otherwise set forth in a Task Order or agreed in writing between the parties hereto, all Work Product is and shall be a "work for hire" and shall be the property of RAE.

(Id. at ¶ 69, Exh C at ¶ 11)

The MSA also included Confidentiality and Non-Use and Preservation of Confidentiality provisions.  (Id. at ¶¶ 70-71)  The Confidentiality and Nondisclosure Agreement's Confidentiality and Non-Use provision provides as follows:

> Except as otherwise permitted by this Agreement, all Confidential Information shall be (a) maintained by Recipient in confidence, (b) will not be disclosed, transferred or otherwise made available by Recipient to any person, firm or organization, and (c) will be used by Recipient only in conjunction with the Purpose.

(Id. at ¶ 71, Exh D at ¶ 2)  The Confidentiality and Nondisclosure Agreement's Non-Use provision also provides that:  "Recipient agrees to use the same degree of care, but not less than reasonable care, to safeguard the confidentiality of the Confidential Information as it uses to safeguard the confidentiality of its own confidential and proprietary information."

(Id. at ¶ 71, Exh D at ¶ 4)

Plaintiffs allege that while constructing the Ruckman facility, M&K received confidential access to their trade secret information, including valuable scientific and technical information regarding Plaintiffs' energy solutions, and engineering and restoration methodologies, such as design of the Ruckman facility, the scientific means to manage anaerobic digestion to create biogas and profit analysis, equipment analysis used in the production of biogas, a comparison of vendor proposals, and the facility testing results. (Id. at ¶ 74) Plaintiffs contend that all of their trade secret information shared with M&K throughout the duration of the MSA and Confidentiality and Nondisclosure Agreement fell within the scope of the agreed upon confidentiality obligations, and if M&K had not agreed to these confidentiality obligations, Plaintiffs would not have shared their trade secret information. (Id. at ¶¶ 75-76)

### D. Patent Application and Ownership

On June 5, 2015, JSME filed a patent application with the United States Patent & Trademark Office, assigned Pub. No. US 2016/0096761 A1 and application number 14/731,320. The application is entitled, "Systems and Methods for Processing Organic Compounds." Plaintiffs contend the 420 patent application contains Plaintiffs' trade secret information.[5] (Id. at ¶¶ 56, 78, Exh A) The 420 patent application sets forth a system and method for processing manure and other organic compounds in anaerobic vessels with improved odor control. (Id. at ¶ 77) The 420 patent application states it supersedes a provisional patent application filed on October 3, 2014, and lists Stanley Meyer and Jason Scott Meyer as the inventors of the process claimed in the application. (Id. at ¶¶ 59-60, Exh A) Defendants also filed a Patent Cooperation Treaty Application on April 7, 2016, claiming priority to an earlier provisional patent

---

[5] The patent application is attached as Exhibit A to the First Amended Complaint. (Id.)

application, demonstrating their intention to expand the scope of their patent rights, if granted, to countries around the world.  (Id. at ¶ 79)

Plaintiffs assert that a review of the published patent application shows that their research and development, products, processes, confidential and proprietary information, and inventions were disclosed and/or claimed in the patent application by JSME.  (Id. at ¶¶ 82-83)

Plaintiffs allege that Elgin shared their trade secret information with JSME for the purpose of using this information in the filed 420 patent applications, and request that Defendants be enjoined from revealing, providing, disclosing, and/or using their trade secret information in the development of such process technology.  (Id. at ¶¶ 61-62)  Plaintiffs allege that Rudolph Roeslein, co-founder and CEO of Roeslein and RAE, is the true inventor of the inventions disclosed and claimed in the 420 patent application.  Accordingly, Plaintiffs assert that they are the true owners of the 420 patent application.  (Id. at ¶ 90)

Plaintiffs further allege that Defendants might have filed other patent applications, continuation applications, or continuation-in-part applications, using Plaintiffs' intellectual property.  (Id. at ¶ 91)  Plaintiffs allege that Defendants have continued to prosecute the 420 patent application, and that the assigned USPTO examiner rejected Claims 1-35 in a Final Office Action on June 29, 2017, resulting in additional irreparable harm.  (Id. at ¶¶ 92-94)  Plaintiffs assert that their ability to monetize the patent rights has been permanently decreased, in that they may be unable to license the patent to others in the industry, or enforce the patent in litigation, as a result of Defendants' improper actions in filing and prosecuting the 420 patent application, and the improper claims of patent ownership.  (Id. at ¶ 98)  Plaintiffs assert that if Defendants are not enjoined from their continued improper actions, and the 420 patent application is not assigned to Plaintiffs, the value of the patent will be permanently decreased.  (Id. at ¶ 99)

**III.**     **Stanley Meyer's 1997 Invention Disclosure**[6] (ECF No. 86-2)

The 1997 Invention Disclosure was signed by Stanley Meyer and filed with the USPTO on October 20, 1997.  In the 1997 Invention Disclosure, Stanley Meyer describes his "process to control odors from manure by digesting the manure into [m]ethane … a two stage anaerobic digestion process to digest the waste and remove the nutrients form the wastewater" at "medium to large animal husbandry operations."  (ECF No. 86-2 at 3)  "The initial anaerobic digestion is carried out in a closed vessel to capture any gasses released, and otherwise proceeds as current practices are."  Id.  Stanley Meyer describes one current practice for the first stage vessel includes an anaerobic lagoon.  Id.  The 1997 Invention Disclosure also describes methods for removing sulfides from the produced natural gas and purifying the methane and "recycling of treated water to clean waste from the animal confinement area, minimizing discharge of waste water."  Id. at 3-5.  The 1997 Invention Disclosure includes a specific example of how Stanley Meyer's invention could be practiced in the field to reduce the overall odor of the operation.  Id. at 4.

**IV.**     **Legal Standards**

A Rule 12 (b)(1) motion to dismiss for lack of subject matter jurisdiction requires a court to determine if a plaintiff has sufficiently alleged a basis for subject matter jurisdiction.  Osborn

---

[6] In the FAC, Plaintiffs refer to the 1997 Invention Disclosure when alleging ownership of the 420 patent application.  Meyer Defendants argue that although the 1997 Invention Disclosure is not attached to the FAC, the Court can consider the 1997 Invention Disclosure in deciding the Rule 12 motions.  "While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment.'"  Miller v. Redwood Toxicology Lab, Inc., 688 F.3d 928, 931 & n.3 (8th Cir. 2012) (quoting 5B Charles Alan Wright& Arthur R. Miller, Federal Practice and Procedure, §1357 (3d ed. 2004)).

v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  Generally, motions under Rule 12(b)(1) take one of two forms:  (1) as a facial attack on the sufficiency of the allegation of subject matter jurisdiction; or (2) a factual attack on the underlying facts upon which subject matter jurisdiction is allegedly based.  A facial attack requires a court to determine if a plaintiff has sufficiently alleged a basis for subject matter jurisdiction.  As with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court evaluating a facial challenge under 12(b)(1) must accept all facts in the complaint as true and view the complaint in the light most favorable to the non-moving party, and "the motion is successful is the plaintiff fails to allege an element necessary for subject matter jurisdiction."  Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993).

A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the sufficiency of a complaint and eliminates those actions "which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." Young v. City of St. Charles, 244 F.3d 623, 627 (8th Cir. 2001).  To survive a motion to dismiss for failure to state a claim, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Braden v. Wal-Mart Stores, Inc. 588 F.3d 585, 594 (8th Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Iqbal, 556 U.S. at 678.  Although a complaint need not contain detailed factual allegations, it must raise a right to relief above the speculative level.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action" are not sufficient to state a claim.  Iqbal, 556 U.S. at 678 (citation and internal quotation marks omitted) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," will not pass muster.).

This standard "calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Twombly, 550 U.S. at 556. "[W]here the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n] – 'that the pleader is entitled to relief,'" the complaint must be dismissed. Iqbal, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)); see Twombly, 550 U.S. at 557-58 ("something beyond the mere possibility of loss causation must be alleged."). The Court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." Id. However, the Court is not required to accept the legal conclusions the plaintiff draws from the facts alleged." Iqbal, 556 U.S. at 678.

V.     **Plaintiffs' Law of the Case Argument** (ECF Nos. 90 and 109)

In their oppositions, Plaintiffs argue that the pending motions to dismiss must be denied because the Court's March 2, 2018, Order granting their motion for leave to amend the complaint over Defendant's futility objections is now law of the case. In support, Plaintiffs rely on Hamlen v. Gateway Energy Servs. Corp., 2018 WL 1568761 (S.D.N.Y. Mar. 29, 2018), arguing that in identical circumstances, a court denied motions to dismiss that repeated the arguments made in a prior, unsuccessful opposition to a motion to amend the complaint. In denying defendant's motion to dismiss, the court held that, in the absence of any compelling new reason, such as a change in the controlling law or assertion that the earlier decision was erroneous, the law of the case doctrine foreclosed defendant's motion to dismiss. See also Teoba v. TruGreen Landcare, LLC, 2013 WL 1560208, at *4 (W.D.N.Y. 2014) (magistrate judge's ruling allowing motion for leave to amend was law of the case and supported district court's

denial of a subsequent motion to dismiss the amended complaint).  In Reply,[7] Meyer Defendants argue that in the March 2, 2018 Order, the Court did not rule on the merits of the motions to dismiss but the Court denied the prior motions to dismiss on procedural grounds as moot in view of granting Plaintiffs leave to file the proposed amended complaint.  Meyer Defendants argue that the 1997 Invention Disclosure and Plaintiffs' recent admission that the '236 provisional patent application does not include their trade secrets constitute substantially different evidence and requires evaluation anew of the inferences that may be properly drawn from the pleaded facts.  Because this evidence was not available for consideration at the time of the earlier ruling, Meyer Defendants contend they did not have a full and fair opportunity to litigate whether Plaintiffs adequately pleaded their claims for patent application ownership and trade secret misappropriation.

The law of the case doctrine is "a means to prevent the relitigation of a settled issue in a case." Gander Mountain Co. v. Cabela's, Inc. 540 F.3d 827, 830 (8th Cir. 2008).  Plaintiffs have offered no authority suggesting that Eighth Circuit precedent does not apply.  Therefore, this Court must follow the standing precedent of the Eighth Circuit.  See Marez v. Saint-Gobain Containers., Inc., 2011 WL 1930706, at * 15 (E.D. Mo. May 18, 2011).  The doctrine "requires courts to adhere to decisions made in earlier proceedings in order to ensure uniformity of decisions, protect the expectations of parties, and promote judicial economy." Id.  But the Eighth Circuit has recognized that "the doctrine of the law of the case is applicable only to final judgments, not to interlocutory orders." Murr Plumbing Inc. v. Scherer Fin. Servs. Co., 48 F.3d 1066, 1070 (8th Cir. 1995) (an order denying a motion to dismiss does not constitute a "final decision" (of "final order") within the meaning of 28 U.S.C. §1292; it is an interlocutory order);

---

[7] M&K in its Reply (ECF No. 114) adopted Meyer Defendants' briefs and arguments on this issue.  M&K noted that Plaintiffs raised this new argument in opposition to grounds for dismissal that were not asserted by Meyer Defendants or M&K in their motions to dismiss.

see also Lovett v. General Motors Corp., 975 F.2d 518, 522 (8th Cir. 1992) (stating "The district court's rulings on [the defendant's] motion to dismiss and motion for summary judgment were not final judgments" so if "a district court is convinced that it incorrectly decided a legal question in an interlocutory ruling, the district court may correct the decision to avoid later reversal."); cf. Fed.R.Civ.P. 54(b) ("[A]ny order … that adjudicates fewer than all the claims … may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

The Court finds that the law of the case doctrine does not preclude consideration of the pending motions. In the earlier Order, the Court denied as moot the motions to dismiss after granting Plaintiffs' leave to file the FAC, finding the proposed amendments were not futile. See Caterpillar Inc. v. Lewis, 519 U.S. 61, 74 (1996). Interlocutory orders "can always be reconsidered and modified by a district court prior to the entry of a final judgment." First Union Nat's Bank v. Pictet Overseas Trust Corp., Ltd., 477 F.3d 616, 620 (8th Cir, 2007). See also Bullock v. Baptist Mem. Hosp., 817 F. 2d 58, 59 (8th Cir. 1987) (order dismissing complaint against some but not all defendants not final order); Lovett, 975 F.2d at 522 (same for denial of motion to dismiss, which is not subject to law-of-the-case doctrine). This Court "has the inherent power to reconsider and modify an interlocutory order any time prior to the entry of judgment," including an "order denying a motion to dismiss a complaint." Murr, 48 F.3d at 1070. Accordingly, the Court will consider the substantive arguments with regard to dismissal of the FAC pending. See Smith v. Central Platte Natural Resources Dist., 735 Fed.Appx. 227, 228, 2018 WL 4055810 (8th Cir. Aug. 27, 2018) (finding no basis for reversal of a district court considering a successive Rule 12(b) motion to dismiss raising the same defenses and objections asserted in an earlier motion to dismiss, except for an abstention argument).

**VI.**   <u>Discussion</u>

**A. Misappropriation of Trade Secrets under Defend Trade Secrets Act ("DTSA")**

Plaintiffs allege a misappropriation of trade secrets under the DTSA in Count I. Plaintiffs pleaded that their trade secret information includes their confidential processes, business information, and facilities relating to the products and/or the services, and that their trade secret information has been released or disclosed by Defendants without their consent or authorization. (ECF No. 76, FAC at ¶¶ 103-04) Plaintiffs further claim that Elgin and M&K knew or had reason to know that their knowledge of Plaintiffs' trade secret information was acquired under circumstances giving rise to a duty to maintain their secrecy. (<u>Id.</u> at ¶¶ 105-06) Plaintiffs further pleaded that Plaintiffs derived significant economic value from their trade secret information not being generally known to other individuals or companies in the industry who could derive significant economic value from the disclosure or use of Plaintiffs' information. (<u>Id.</u> at ¶ 102) Plaintiffs allege that JSME and EMB knew or had reason to know that their knowledge of Plaintiffs' trade secret information was derived through Elgin and M&K, and both owed a separate duty to Plaintiffs to maintain their trade secret information. (<u>Id.</u> at ¶ 107) Plaintiffs pleaded that Defendants' misappropriation of their trade secret information is continuing and ongoing by the continued prosecution of the patent application and the construction of the Roswell facility, and as a result of their misappropriation, Plaintiffs will suffer actual losses and irreparable harm if Defendants' misconduct is not enjoined. (<u>Id.</u> at ¶¶ 54-60, 92-93,110-11, 115, 117, 119)

Meyer Defendants contend that Plaintiffs fail to allege any acts of misappropriation after May 11, 2016, the date the DTSA was enacted, in support of the DTSA cause of action other than conclusory allegations of continuing use and disclosure. (ECF Nos. 85-86) Meyer

Defendants point out that Plaintiffs allege only two acts of misappropriation that allegedly occurred after the May 11, 2016:  (1) the inclusion of their trade secret information in JSME's patent application; and (2) the continued use of their trade secret information in the construction of the Roswell, New Mexico facility.  Meyer Defendants note that the 420 patent application published on April 7, 2016, before the DTSA came into effect, and the continued use of Plaintiffs' trade secret information at the Roswell facility fails because the FAC fails to describe whether the information utilized at the Roswell facility after May 11, 2016, was new or somehow different from the prior misappropriation at that facility.  Meyer Defendants further contend that the FAC fails to adequately describe the trade secret information allegedly misappropriated at the Roswell facility.  Meyer Defendants also argue that, even if Plaintiffs have properly alleged an act of misappropriation falling within the scope of the DTSA, the FAC fails to plead enough facts showing their claims are plausible, especially now that the record includes Stanley Meyer's 1997 Invention Disclosure, which describes JSME's renewable energy technology developed before Meyer Defendants were alleged to have access to Plaintiffs' trade secrets.

M&K argues that Count I should be dismissed as indefinite because none of the Defendants are related entities but the FAC fails to parse out which of the acts were performed by M&K, as opposed to the other Defendants, Elgin, JSME, and EMB or to specify the trade secret information that were misappropriated at the New Mexico project, shared with Smithfield, or disclosed in the patent application.

In opposition (ECF No. 90), Plaintiffs contend that they properly assert a continued misappropriation claim starting as early as October 3, 2014, and continuing to this day.  Plaintiffs assert that the FAC contains allegations of Defendants' ongoing misappropriation through their

continued use of the protected information to this day through their patent application and the operation of their various businesses. Next, Plaintiffs argue that the FAC contains sufficient allegations at this stage and that any particularity in pleading Defendants seek regarding their trade secret claims may be addressed through the discovery process and ultimately challenged at the summary judgment stage. Plaintiffs argue that they have set forth general categories of their trade secret information[8] and this is all that is required to survive a motion to dismiss. Plaintiffs also argue that more detail would result in public disclosure and loss of their trade secret information. Plaintiffs note that courts in this district have held that it is more prudent to wait until the summary judgment stage to evaluate the sufficiency of the particularity of their claimed trade secrets. Plaintiffs argue that just because some information relating to their trade secrets such as a general description of biological and mechanical energy conversion process is publicly available does not destroy the trade secrets. Plaintiffs also contend that they alleged sufficient facts to show that they took reasonable efforts to protect the secrecy of their trade secret information, and a determination of whether the steps were reasonable is an inquiry more appropriate at the summary judgment stage.

In their reply (ECF No. 100), Meyer Defendants contend that the FAC fails to sufficiently allege an act of misappropriation occurring on or after May 11, 2016. Meyer Defendants argue that the trade secret claims should be dismissed because the conclusory allegations of continued misappropriation are insufficient to sustain a claim under the DTSA. Meyer Defendants argue that Plaintiffs' conclusory allegation that they continued to use Plaintiffs' trade secrets to help

---

[8] Plaintiffs assert that the FAC identifies their trade secrets as: (1) the methodology employed by Plaintiffs to maintain the necessary temperature in its lagoons to ensure the natural production of biogas; (2) the means by which biogas is scrubbed, i.e., made transportable and usable as energy; (3) mechanisms to remove Hydrogen Sulfide, a necessary step in generating safe, usable biogas; (4) methodologies and formula for the balance of animal solids to liquid in the lagoons in which biogas is generated; and (5) estimate of organic loading and emissions rate to properly plan and size the Ruckman facility and future facilities.

construct the Roswell facility fails under the DTSA because the DTSA does not permit a misappropriation claim to be based on the continued use of information that was disclosed prior to the effective date of the statute. Meyer Defendants argue dismissal of the DTSA claim for failure to state a claim is appropriate because the FAC does not allege "facts about when post-enactment use occurred and whether the information disclosed was new or somehow different form the prior misappropriation." Meyer Defendants contend that because Counts I and II are subject to dismissal, the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law MUTSA claim in Count III.

On May 11, 2016, Congress enacted the DTSA of 2016, Pub. L. No. 114-153, 130 Stat. 376, creating a new private civil cause of action in favor of the "owner of a trade secret that is misappropriated … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (2016). "It is clear that Congress borrowed heavily from the [Uniform Trade Secrets Act] and the states' trade secrets law in drafting many (if not most) provisions of the DTSA. The enactment of the DTSA was not a response to an inherent inadequacy in the states' trade secrets laws. Rather, … Congress intended the DTSA to apply in substantially the same way as the states' trade secrets laws, but with a much broader geographic and jurisdictional reach." Brand Energy & Infrastructure Servs, Inc. v. Irex Contracting Grp, 2017 WL 1105648, at *7 (E.D. Pa. Mar. 24, 2017) (internal quotations and citations omitted). Unlike the UTSA's provisions stating that it "does not apply to a misappropriation occurring prior to the effective date" and does not apply to a "continuing misappropriation that occurs after the effective date," Uniform Trade Secrets Act ("UTSA") § 11, the DTSA does not contain such provisions. See Brand Energy, 2017 WL 1105648, at *8 (finding "Congress clearly expressed its intent to apply the DTSA to continuing

misappropriations that began prior to – but continued after – the DTSA's enactment.").

The DTSA defines a trade secret as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if – (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3)

A misappropriation occurs when: (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent. See Mission Measurement Corp. v. Blackbaud, Inc., 2016 WL 6277496, at *4 (N.D. Ill. Oct. 27, 2016) (citing 18 U.S.C. § 1839(5)); Cent. Trust & Inv. Co. v. Signalpoint Asset Mgmt., LLC, 422 S.W.3d 312, 322 (Mo. 2014). The DTSA by its own terms applies only to an act of trade-secret misappropriation that "occurs on after the date of the enactment of this Act." Pub. L. No. 114-153, § 2(e), 18 U.S.C. §1836. The DTSA became effective on May 11, 2016. Whether a trade secret has been misappropriated is a question of fact. See Insituform Techs., Inc. v. Reynolds, Inc., 398 F.Supp.2d 1058, 1063-64 (E.D. Mo. 2005); Reliant Care Mgmt., Co. v. Health Sys, Inc., 2011 WL 432619, at *8 (E.D. Mo. 2011) ("The issue of whether a defendant has misappropriated a trade secret is a question of fact."). See also 86 C.J.S. Torts § 117 (2009) ("In an action for misappropriation of trade secrets … whether a trade secret has been misappropriated … [is a] question of fact.").

Generally known information cannot be a protectable trade secret.  See Mgmt. and Engineering Techs. Intern., Inc. v. Info. Sys. Support, Inc., 490 Fed. Appx. 30, 34 (9th Cir. 2012) (information that anyone can google is not a trade secret); Penalty Kick Mgmt, Ltd. v. Coca Cola Co., 318 F.3d 1284, 1291 (11th Cir. 2003) (Whether information constitutes a trade secret is a question of fact).  The extent to which the information is known outside of a business is relevant in determining whether something is a trade secret.  See Northwest Airlines v. American Airlines, 853 F. Supp. 1110, 1113 (D. Minn. 1994) (An employee has reason to know that information of its employer is a trade secret, as opposed to generally known information, if the employee knows that the employer owner intends or expects that the information will remain confidential.).  But see O2 Micro Int'l Ltd. V. Monolithic Power Sys., Inc., 420 F. Supp. 2d 1070, 1089 (N.D. Cal. 2006), aff'd, 221 Fed.Appx. 996 (Fed. Cir. 2007) (combinations of generally known information when combined in a novel way can be a trade secret).  "The existence … of a trade secret usually is treated as a question of fact." Chevron U.S.A., Inc. v. Roxen Serv., Inc., 813 F.2d 26, 29 (2d Cir. 1987); Oneida Group, Inc. v. Steelite Int'l U.S.A., Inc., 2017 WL 6459464, at *6 (E.D.N.Y. Dec. 15, 2017) ("Whether the information was a secret is generally a question of fact.").

To prevail on its trade secrets claim, Plaintiffs must show that (1) they took reasonable measures to keep the information secret, (2) the information derives independent economic value from not being generally known or readily ascertainable, and (3) the information was misappropriated by Defendants.

The only post-DTSA enactment allegations set forth in the FAC are:  "The facility near Roswell, New Mexico uses technology developed by Plaintiffs and shared with Elgin, JS Meyer, EM Bioenergy, and M&K.  Elgin and the other defendants used this technology to not only

construct the New Mexico facility, but also to convince individuals and companies to provide financing for the New Mexico project[;]" and the continued pursuit of the 420 patent application. (ECF No. 76, FAC, ¶¶ 55, 107)  In Count I Plaintiffs further allege that "Defendants' misappropriation of Plaintiff's Trade Secret Information is continuing and ongoing.  And upon information and belief, Elgin continues to give presentations in the industry in which he pitches his knowledge of biogas production, obtained from the misappropriation of Plaintiffs' Trade Secret Information, including a recent pitch in or about August, 2017."  (Id. at ¶ 109)

A plaintiff states a plausible claim for relief only if it "sufficiently alleges a prohibited 'act' occurring after May 11, 2016."  Adams Arms, LLC v. United Weapon Sys., Inc., 2016 WL 5391394, at *6 (M.D. Fla. Sept. 27, 2016) (distinguishing between a disclosure theory and an acquisition theory of recovery, and finding that the plaintiff had stated a claim for disclosure occurring after May 11, 2016, but not for alleged acquisition that occurred prior to the effective date of the DTSA).  "Congress omitted from the DTSA the following language form Section 11 of the [Uniform Trade Secrets Act]:  'With respect to a continuing misappropriation that began prior to the effective date, the [Act] also does not apply to the continuing misappropriation that occurs after the effective date."  Id. (quoting UTSA §11).

Given the enactment date of the DTSA, there is no precedent on this issue by any Court of Appeals.  Only one Judge in the Eastern District of Missouri has addressed the merits of a DTSA claim.  See Flowshare, LLC v. TNS, US, LLC, 4:16 CV 300 JAR, 2017 WL 3174321, at *5 (E.D. Mo. July 26, 2017) (denying motion to dismiss as directed to DTSA).  The other cases from this District address the DTSA in the context of a motion for preliminary injunction or temporary restraining order but not addressing any merits of the DTSA claim itself.  See Siteone Landscape Supply, LLC v. Beckham, 4:17 cv 2898 JAR, 2018 WL 324238, at *1 (E.D. Mo. Jan.

4, 2018; <u>Aerote, Inc. v. Joel T. Murphy, et. al.</u>, 4:17 cv 2469 HEA, 2017WL4617109 (E.D. Mo.

Oct 16, 2017); <u>Express Scripts, Inc. v. Lavin</u>, 4:17 cv 1423 HEA, 2017 WL 290325, at *6 (E.D.

Mo. July 7, 2017); <u>Schlafly Revocable Trust v. Cori</u>, 4:16 cv 1631 JAR, 2016 WL 11133, at *1-2

(Nov. 9, 2016); <u>Id.</u>, 2017 WL 1374743, at *6-7 (E.D. Mo. April 17, 2017) (granting motion for

leave to file an amended complaint and denying motion for second TRO). The courts in this

District have not weighed in on the issue of whether allegations of continuing use are sufficient

to state a DTSA claim and so this issue remains open and unresolved.

Although no case law on this issue exists in the Eighth Circuit or this District, each side

has found precedent elsewhere supporting its position. In support of Plaintiffs' position that the

DTSA can be applied to a trade secret misappropriation occurring prior to the DTSA's enactment

if the misappropriation continues to occur after the enactment date of May 11, 2016, Plaintiffs

rely on <u>Brand Energy</u>, 2017 WL 1105648, at *4 (employer sued former employees for pre- and

post-enactment violations of the DTSA, including allegations that the former employees were

actively using the trade secrets to complete with the employer after enactment of DTSA) and

<u>Syntel Sterling Best Shores Mauritus, Ltd. V. Trizetto Group, Inc.</u>, 2016 WL 5338550, at *6

(S.D.N.Y. Sept. 23, 2016) (finding viable a continuing misappropriation claim that occurred pre-

enactment because the DTSA defines misappropriation as the "disclosure or use of a trade

secret" and the complaint alleged that the defendants "continue[d] to use" the trade secrets after

the DTSA was enacted) (quoting 18 U.S.C. § 1839(5)(B)). In support of Defendants' position

that the DTSA does not permit "a misappropriation claim based on the continued use of

information that was disclosed prior to the effective date of the statute[,]" Defendants rely on

<u>Avago Techs. U.S. Inc. v. Nanoprecision Prod., Inc.</u>, 2017 WL 412524, at *9 (N.D. Cal. Jan. 31,

2017) (finding no "authority suggesting that the DTSA allows a misappropriation claim to be

asserted based on the continued use of information that was disclosed prior to the effective date of the statute" and holding allegations that confidential information was disclosed when the Avago Applications were published, prior to the DTSA enactment, not sufficient because the DTSA does not allow a misappropriation claim to be asserted based on the continued use of information that was disclosed prior to the effective date of the statute) and Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc., 2017 WL 1436044, at *5 (N.D. Cal. Apr. 24, 2017) (finding that "without facts about when post-enactment use occurred and whether the information disclosed was new or somehow different from the prior misappropriation, plaintiff has failed to state a claims under the DTSA").

After careful consideration of the parties' arguments, the emerging DTSA case law, and the statutory language of the DTSA, the undersigned finds that the DTSA applies to a trade secret  misappropriation that continues after the DTSA's enactment date, even if the misappropriation began before the enactment date.  First, as noted above, there is significant difference if the statutory language of the DTSA when compared to the UTSA.  The UTSA expressly states that it "does not apply to a misappropriation occurring prior to the effective date" and does not apply to a "continuing misappropriation that occurs after the effective date." UTSA § 11.  The omission of that language in the DTSA is significant and must be given meaning in resolving the pending dispute.  The undersigned finds that the best view of the emerging case law supports a conclusion that Congress intended that the DTSA apply to continuing acts of misappropriation, even if the misappropriation began prior to the effective date of the DTSA.  Brand, 2017 WL 1105648, at *8.  See also Teva Pharm. USA, Inc. v. Sandhu, 291 F. Supp. 3d 659, 674-75 (E.D. Pa. 2018) (opining that "one who acquired and used a trade secret before enactment of the DTSA and continues to use it after enactment is liable"); Telsa

Wall Sys., LLC v. Related Companies, L.P., 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017) (finding a plausible DTSA claim arising out of defendants' pre-enactment conduct by alleging defendants' misappropriation of trade secrets was ongoing); Quintiles IMS Inc. v. Veeva Sys. Inc., 2017 WL 4842377, at *4 (D.N.J. Oct. 26, 2017) (holding "allegations of pre-enactment acquisition of a trade secret coupled with post-enactment continued use are sufficient to sustain a claim under the [DTSA] at the motion to dismiss phase." (citation omitted); VIA Techs, Inc. v. ASUA Computer Int'l, 2017 WL 491172, at *2 (N.D. Cal. Feb. 7, 2017) (holding that DTSA is "applicable to wrongful conduct occurring prior to its enactment if the conduct continues after May 11, 2016."); Adams Arms, 2016 WL 5391394, at *5-7 (finding viable a continuing misappropriation claim that began pre-enactment because the DTSA); Allstate Ins. Co. v. Rote, 2016 WL 8902597 (D. Or. Nov. 14, 2016) (granting preliminary injunction in DTSA case where the defendant left her job before the DTSA was enacted but remained in possession of alleged trade secrets after the DTSA's enactment); Henry Schein, Inc. v. Cook, 191 F. Supp. 3d 1072, 1076-78 (N.D. Cal. 2016) (same with TRO). "Nothing suggests that the DTSA forecloses a use-based theory simply because the trade secret being used was misappropriated before the DTSA' enactment." Cave Consulting, 2017 WL 1436044, at *4-5 (dismissing a DTSA claim where the plaintiff alleged that the defendant acquired, used, and shared the trade secrets at issue in 2014 and 2015 without any "specific allegations that defendant used the alleged trade secrets after the DTSA's May 11, 2016 enactment," but the court granted leave to amend if the plaintiff could allege improper use after that date).

In the FAC, Plaintiffs alleged multiple uses of their trade secrets in the operation of the Roswell facility that continued to occur after the DTSA enactment date. Plaintiffs have properly asserted a continued and ongoing misappropriation claim by pleading that Defendants used their

trade secret information to facilitate in the construction of the New Mexico Project and then continued by using technology at the facility developed by Plaintiffs.  Accordingly, Plaintiffs have sufficiently stated a claim for continuing misappropriation by alleging some act of misappropriation occurring on or after May 11, 2016.

Likewise, Plaintiffs' FAC adequately satisfies the pleading standard.  Plaintiffs pleaded their trade secrets with sufficient particularity by putting forth general categories of their trade secrets, including their process technology (the conversion of animal waste to biogas), facilities overview information, and finances.  Plaintiffs further pleaded such information derived economic value from not being generally known to, and not being readily ascertainable by, other persons.  None of the cases from within the Eighth Circuit expressly delineate a particularity requirement for the pleading stage of a trade secrets case.  In Young Dental Mfg. Co. v. Q3 Special Prods., Inc., 891 F. Supp. 1345, 1349-52 (E.D. Mo. 1995), our Court suggested it would be more prudent to wait until the summary judgment stage to evaluate the sufficiency of the particularity of Plaintiff's claimed trade secrets.  See also EnviroPAK Corp. v. Zeninity Capital, LLC, 2015 WL 331807, at *4 (E.D. Mo. Jan. 23, 2015).  As such, Plaintiffs have pleaded sufficient facts to establish the existence of trade secrets and that Plaintiffs took reasonable steps to protect their trade secret information.  A determination of whether those steps were actually reasonable to protect Plaintiffs' trade secret information is premature at this point.  See Flowshare, 2017 WL 3174321, at *5.  Finally, any particularity in pleading Defendants seek regarding Plaintiffs' trade secret information may be addressed through the discovery process in this litigation and ultimately challenged at the summary judgment stage of this case.

**B.  Declaratory Judgment of Ownership of 420 Patent Application**

In Count II of the FAC, Plaintiffs ask the Court to allow them to control the remaining

prosecution of the patent application as the true and rightful owners, or alternatively, declare and order that Defendants assign all of their rights or ownership interest in the patent application to them.  (ECF No. 76, Exh A, FAC at ¶¶ 90, 116)  The FAC cites the Declaratory Judgment Act, 28 U.S.C. § 2201, as the basis for this Court's subject matter jurisdiction.[9]  In support, Plaintiffs allege that Elgin and M&K disclosed Plaintiffs' intellectual property to Stanley and Jayson Meyer who used such information in the 420 patent application.  Plaintiffs' FAC seeks a declaratory judgment that Plaintiffs are the lawful owners of all patentable embodiments encompassed in the 420 patent application.

Meyer Defendants argue that Plaintiffs' declaratory judgment claim for patent ownership should be dismissed as premature and, in any event, not supported by sufficient facts.  (ECF Nos. 85-86)  Meyer Defendants contend that the FAC provides only two theories of ownership of the 420 patent application:  (1) Rudolph Roeslein is the true inventor of the inventions disclosed or claimed in the application, and (2) the 420 patent application was conceived or invented by Elgin.  Meyer Defendants assert that Plaintiffs are asking the Court to transfer ownership of the 420 patent application from JSME to Plaintiffs, but the Court lacks subject matter jurisdiction to correct ownership, and a private right of action only matures when the application issues as a patent.  Further, Meyer Defendants contend that even if the Court has subject matter jurisdiction, the FAC fails to plead sufficient facts to "nudge [the ownership] claims across the line from conceivable to plausible."  Twombly, 550 U.S. at 570.  In support, Meyer Defendants note that the FAC is void of any non-conclusory allegations showing that Roeslein and Elgin made a significant contribution to at least one claim of the 420 patent application.

---

[9] The Declaratory Judgment Act, cited by Plaintiffs, does not provide an independent basis for subject matter jurisdiction, rather, it is remedial only.  See First Fed. Sav. & Loan Ass'n of Harrison, Ark. v. Anderson, 681 F.2d 528, 533 (8th Cir. 1982) (citing Shell Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950)).

In opposition (ECF No. 90), Plaintiffs argue that the FAC alleges that Elgin passed Plaintiffs' trade secret information to JSME for the purpose of filing the 236 provisional patent application and the 420 patent application. Plaintiffs contend that this clarification in the FAC does not change the substance of the allegations and that they have adequately pleaded ownership of the 420 patent application. Next, Plaintiffs argue that that Court has subject matter jurisdiction to make a determination of ownership of the 420 patent application. Plaintiffs argue that they have pleaded sufficient facts to establish that they have standing to bring the declaratory judgment claim. Next, Plaintiffs argue that they have properly pleaded all necessary facts to support their claim for a declaratory judgment of patent ownership by alleging in the FAC that their trade secret information appears in the pending patent application, as well as the prior provisional application, thereby showing the link how their trade secret information appeared in JSME's patent applications. Plaintiffs assert that the 420 patent application contains, in the originally file specification and claim set, Plaintiffs' misappropriated trade secret information, and that the amendment of the current specification to correspond to the 1997 Invention Disclosure is irrelevant because the file history still contains Plaintiffs' trade secret information in the current claims. Plaintiffs contend that JSME could later amend the 420 patent application to reintroduce their trade secrets.

In their Reply (ECF No. 100), Meyer Defendants argue that Plaintiffs cannot show that they invented the subject matter of the 420 patent application, not Stanley Meyer, based on the presence of their trade secrets in the 420 patent application. Meyer Defendants argue that ownership of a patent application initially vests in the inventor who may transfer that right to another. Meyer Defendants argue that the Court lacks subject matter jurisdiction to adjudicate Plaintiffs' ownership claim because this requires a determination of inventorship which cannot

be determined by this Court until the 420 application issues as a patent. Even if the Court has subject matter jurisdiction, Meyer Defendants contend that Plaintiffs' ownership claim is not plausible because the 1997 Invention Disclosure shows the pending claims and disclosure of the 420 patent application were invented by Stanley Meyer in 1997, and Plaintiffs failed to allege facts showing that their trade secrets appears in the original disclosure of the 420 patent application.

As to M&K, Plaintiffs concede that M&K should be dismissed without prejudice from Count II inasmuch as M&K has affirmatively disclaimed any ownership interest in the 420 patent application. (ECF No. 109 at V)

Appellate case law holds that claims for inventorship are not ripe for judicial review unless and until the patent has issued. E.I. Du Pont de Nemours & Co. v. Okuley, 344. F.3d 578, 582 (6th Cir. 2003) (citing Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248 (Fed.Cir. 1993)); 35 U.S.C. § 116 (no private right of action to challenge inventorship of a pending patent application). See also Stevens v. Broad Reach, Cos., L.L.C., 2006 WL 1556313, at *3-4 (W.D. Mo. May 31, 2006) (citing Okuley and granting motion to dismiss action based on pending patent application); Sagoma Plastics, Inc. v. Gelardi, 366 F.Supp.2d 185, 188 (D. Me. 2005) (granting motion to dismiss claim based on inventorship of unissued patent because "a court might grant relief to a plaintiff inventor only to have the [Patent and Trademark Office] … deny the patent application in its entirety. It seems unlikely that Congress intended to authorize a scheme in which such a waste of scarce judicial resources was possible."). Federal courts do not have authority to adjudicate claims with respect to pending patents because such authority is vested exclusively in the Patent and Trademark Office until a patent has actually issued. See, e.g., Camsoft Data Sys., Inc. v. Southern Electronics Supply, Inc., 756 F.3d 327, 334 (5th Cir.

2014), <u>HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.</u>, 600 F.3d 1347, 1354 (Fed. Cir. 2010);

<u>Okuley</u>, 344 F.3d at 583-84.

Here, JSME has filed a patent application but a patent has not issued so any inventorship

claims in the FAC are non-justiciable, and this Court lacks subject matter jurisdiction over this

claim. Fed.R.Civ.P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter

jurisdiction, the court must dismiss the action."). Accordingly, Count II of the FAC will be

dismissed for lack of subject matter jurisdiction. Although Elgin did not file a motion to dismiss

or join Defendants' motions to dismiss, since the Court found it lacks subject-matter jurisdiction

over this claim, it may dismiss this claim against Elgin as well.

### C. Misappropriation of Trade Secrets - Missouri Uniform Trade Secrets Act ("MUTSA")

In Count III, Plaintiffs advance a claim under the MUTSA. The arguments presented by

Plaintiffs and Defendants regarding the allegations under the MUTSA are similar if not

identical to their arguments under the DTSA.[10] Accordingly, for at least the reasons discussed

in the earlier section, the Court finds Plaintiffs have stated a viable claim under the MUTSA at

this pleading stage, and their allegations are at least minimally sound under 12(b)(6).

### D. Breach of Contract - Elgin

In Count IV of the FAC, Plaintiffs allege a breach of contract claim against Elgin only.

On March 28, 2018, Elgin filed an Answer to Count IV.

### E. Breach of Fiduciary Duty - Elgin

In Count V of the FAC, Plaintiffs allege that Elgin, in his capacity as a director for

Plaintiffs and a vice president of RAEM, owed Plaintiffs a fiduciary duty. That duty included a

---

[10] A difference is the DTSA enactment date of May 11, 2016. 18 U.S.C. § 1836.

duty to act and give advice for Plaintiffs' benefit, to act in good faith and in Plaintiffs' best interests, to exercise independent professional judgment, to represent no adverse interests, and to make full disclosure to Plaintiffs of all known information that was material to Plaintiffs' affairs. (ECF No. 76, FAC at ¶ 149)  Plaintiffs further allege that their trade secret information was acquired by Elgin under the auspices of trust, a promise of non-disclosure, in the context of the parties' confidential relationship, and that Elgin allegedly disclosed the trade secret information causing significant negative financial impact to Plaintiffs' businesses.  (Id. at ¶¶ 150, 152-53)

On March 28, 2018, Elgin filed an Answer to this count.  Count V is directed only to Elgin.

### F.  Breach of Contract – M&K

In Count VI of the FAC, Plaintiffs seek relief for M&K's alleged breach of the MSA and the M&K Confidentiality Agreement.  On October 15, 2014, RAE hired M&K to perform engineering services and processes for RAEM and to assist in the design and the construction of the Ruckman facility.  On that date, RAEM entered into the MSA with M&K to perform engineering services and the MSA included a confidentiality provision, a non-use provision, and an intellectual property provision.  RAE and M&K entered into the Confidentiality and Nondisclosure Agreement on that same day.  RAE is the signatory to the MSA, and RAE is the sole member of RAEM.

M&K argues that Plaintiffs lack standing to enforce the MSA because neither one is a signatory to the MSA, only non-party RAEM is a signatory, so Plaintiffs never had any rights or interest in the MSA and did not suffer injury due to its alleged breach.  (ECF No. 105)  M&K also asserts that in the absence of a necessary party, RAEM, this count should be dismissed because this count subjects M&K to the risk of an additional suit by RAEM for the same

wrongdoing and impede RAEM's ability to protect its interests." (ECF No.105 at 6-7)[11] M&K argues that this count should be dismissed as indefinite because the allegations only vaguely define Plaintiffs' trade secret information and do not separate which alleged trade secrets are owned by Roeslein and which trade secrets are owned by RAE.

In opposition (ECF No. 109), Plaintiffs argue that RAEM is not a necessary party because RAE is the sole member of RAEM, and a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy so M&K is not at risk of second litigation.

In Reply (ECF No. 114), M&K argues that Plaintiffs' failure to address how RAEM not being joined as a party may impair or impede RAE's ability to protect its rights under the MSA is a concession that RAEM's absence from this case will impede RAEM's ability to protect its rights under the MSA. Next, M&K asserts that if RAEM were to file a second lawsuit, it would not be considered a proxy for RAE. M&K argues that RAEM, as a party to the MSA, is a real party in interest in its own right, separate from any rights RAE may have and could therefore file a second lawsuit without being precluded by the outcome of this case.

Under Missouri law, to state a claim for breach of contract, a plaintiff "'must establish the existence of a valid contract, the rights of plaintiff and obligations of defendant under the contract, a breach by defendant and damages resulting from the breach.'" Gillis v. Principia Corp., 834 F.3d 865, 871 (8th Cir. 2016) (quoting Lucero v. Curators of Univ. of Mo., 400 S.W.3d 1, 5 (Mo. Ct. App. 2013)); Keveney v. Missouri Military Acad., 304 S.W.3d 98, 104 (Mo. banc 2010) (essential elements of a breach of contract action are: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract;

---

[11] Even if the Court found RAEM to be a necessary party, the Eighth Circuit has cautioned that "the proper procedure under Rule 19(a) is to give the parties an opportunity to bring in such a party, not dismiss the action." Ranger Transp., Inc. v. Wal-Mart Stores, 903 F.2d 1185, 1187 (8th Cir. 1990); Northern Assur. Co. of America v. Kendell, 2009 WL 1096301, at *2 (April 22, 2009).

(3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff."). Only a party to a contract may enforce it. Grgic v. Cochran, 689 S.W.2dd 687, 690 (Mo. Ct. App. 1985); see also 13 Richard A. Lord, Willison on Contracts § 37:1 (noting general rule that "strangers to a contract have no rights under the contract.").

In the FAC, Plaintiffs allege that RAE is the sole member of RAEM thereby making RAE in privity with a party to the agreement. Plaintiffs contend that although neither Plaintiff was a signatory of the MSA, Plaintiffs have alleged in the FAC how they are in privity with RAEM, a party to the MSA, and therefore they have standing to challenge any purported breach of rights and obligations of that agreement.

The Supreme Court decision in Taylor v. Sturgell, 533 U.S. 880 (2008), clarified the rules of preclusion under federal common law. The general rule is that "'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" Taylor, 533 U.S. at 884 (quoting Hansberry v. Lee, 311 U.S. 32, 40 (1940)). However, the Supreme Court held that there are six exceptions to this general rule and parties and their privies are bound by a judgment when: (1) the nonparty agreed to be bound by the litigation of others; (2) a substantive legal relationship existed between the person to be bound and a party to the judgment; (3) the nonparty was adequately represented by someone who was a party to the suit; (4) the nonparty assumed control over the litigation in which the judgment was issued; (5) a party attempted to relitigate issues through a proxy; or (6) a statutory scheme foreclosed successive litigation by nonlitigants. Id. at 893-94. Plaintiffs contend that one exception applies in the instant case, privity can be found for preclusion purposes because RAE is the sole member of RAEM, and a party bound by a judgment may not attempt to relitigate issues through a proxy. Id. at 895. Here, Plaintiffs and RAEM share the

sane interest to prove that M&K breached the MSA. After careful review, the Court concludes that this exception applies in the instant case.

The Court finds M&K's argument that RAEM is a necessary party is without merit. Rule 19(a) provides that an absent party is necessary to a suit when without that party "complete relief cannot be accorded among those already parties." Fed.R.Civ.P. 19(a). The Supreme Court has directed courts to evaluate the potential for prejudice under Rule 19 while considering the practical context in which a case arises. See Provident Trademens Bank & Trust Co. v. Patterson, 390 U.S. 102 (1968); see also Fed.R.Civ.P. 19 advisory committee's note (1966) ("[T]he case should be examined pragmatically and a choice made between the alternatives of proceeding with the action in the absence of particular interested persons, and dismissing the action").

Plaintiffs' FAC adequately pleads a breach of contract claim. Whether Plaintiffs will prevail, based on the contract provisions of the MSA, is not suitable for the Court to decide the motion to dismiss stage. Accordingly, the motion to dismiss the breach of contract claim will be denied.

**VI.    Conclusion**

**IT IS HEREBY ORDERED** that Meyer Defendants' Motion to Dismiss the First Amended Complaint (ECF No. 85) and M&K's Motion to Dismiss the First Amended Complaint (ECF No. 105) are GRANTED IN PART and DENIED IN PART as follows:

1. The motions to dismiss are GRANTED as to Count II, and the motions to dismiss are DENIED as to Counts I, III, and VI.

2. Plaintiffs' claim for declaratory judgment of ownership of 420 patent application in Count II is DISMISSED.

**IT IS FURTHER ORDERED** that this Court will issue an appropriate order of Partial

Dismissal in accordance with this Memorandum and Order.

The case will be set for a Rule 16 scheduling conference by separate Order.


/s/ ***John M. Bodenhausen***
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of January, 2019.